703 A.2d 194

MT. OLIVE AFRICAN METHODIST EPISCOPAL
CHURCH OF FRUITLAND, INC. et al.

v.

BOARD OF INCORPORATORS OF the AFRICAN
METHODIST EPISCOPAL CHURCH INC. et
al.

No. 26, Sept. Term, 1996.

Court of Appeals of Maryland.

Dec. 19, 1997.

**300**

John C. Seipp, Salisbury, for Petitioners.

Thomas E. Starnes (A. Lindsey Crawford, Andrews & Kurth, L.L.P., on brief), Washington, DC, Leronia A. Josey, Baltimore, on brief, for Respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI,* RAKER and WILNER, JJ.

BELL, Chief Judge.

This appeal arose out of a dispute between a local church and the religious hierarchy with which it had been affiliated for more than one hundred years. The dispute concerns ownership of real property titled in the name of the trustees of the local church, and the question presented for our resolution is whether the trustees and the local congregation lost the rights given them by the deed of the property and confirmed by the Religious Corporations Law[1] and the corporate char-

---

* Karwacki, J. now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the adoption of this opinion.

1. Maryland Code (1975, 1993 Repl.Vol.) §§ 5–301—5–336 of the Corporations and Associations Article. Sections 5–301—313 treat the subject generally, while the remaining sections address specific denominations, *i.e.,* Roman Catholic (§§ 5–314–320), United Methodist (§§ 5–321—28), United Presbyterian Church in the United States of America (§§ 5–329–

ter, to own, use and control that property, when the pastor, trustees, officers, and a majority of the congregation of the local church withdrew from that affiliation.

## I

Mount Olive African Methodist Episcopal Church of Fruitland, Inc. (Mt. Olive), the petitioner, was established in Fruitland, Maryland in 1886. Then known as Carr Black Church, the congregation became affiliated with the African Methodist Episcopal Church (the "A.M.E.") one year later, at which time, it changed the church's name to Mt. Olive A.M.E. Church. The local church was formally incorporated under Maryland law on April 13, 1894. The Certificate of Incorporation ("charter") filed on that date in the Circuit Court for Wicomico County, provided, in pertinent part, as follows:

"Know all men by these presents,

"That the members of the African Methodist Episcopal Church situated at Fruitland Wicomico County State of Maryland ... at the church building known as Mount Olive on the thirteenth day of April Eighteen hundred and ninety four ... then and there resolved to organize and constitute themselves as a body politic or corporate and for that purpose elected Ebin Stanford, William Cornish, William Cottman, Nathaniel Stanford, S.C. Bulter and Ephraim Banks as Trustees in the name and on behalf of the said Mount Olive African Methodist Episcopal Church and congregation under the provisions of the Public General laws of Maryland and at the said meeting adopted the following regulations, to Wit:

\* \* \* \* \* \*

"4. The name of this Corporation shall be Mount Olive African Methodist Episcopal Church of Fruitland and the Congregation Mount Olive.

---

332), Protestant Episcopal Church, Diocese of Maryland (§§ 5–332–336). Unless otherwise indicated, all future references will be to the general provisions of that act.

"5. The power and authority of said Trustees shall be in subjection to the discipline of said church and the property held by them in trust for the use of the ministry and membership of said church as a place of worship and as a parsonage or dwelling house for the preacher subject to the ministerial appointment of the proper authorities in said church."

* * * * * *

On September 16, 1993, when the petitioner withdrew from the A.M.E., the church owned two pieces of real property, a parsonage property acquired in 1913 and a sanctuary property purchased in 1975. The deeds to the properties conveyed the real estate involved to the "Mt. Olive African Methodist Episcopal Church of Fruitland, Inc., in fee simple." Neither referred to the parent A.M.E. Church, the respondent,[2] by name, nor contained any explicit conditions, restriction, or reversions in its favor. Neither deed indicated that the property was being held in trust for the A.M.E.

The A.M.E. is an hierarchical, connectional[3] denomination, in which each individual affiliate church belongs and makes financial payments to the A.M.E. "Connection" through area

---

2. The Board of Incorporators of the African Methodist Episcopal Church, Inc., the corporate name of the African Methodist Episcopal Church and the body charged with protecting the property rights of the denomination, was a plaintiff in the circuit court and is one of the respondents in this Court. Other respondents include four members and four trustees of the Mt. Olive African Methodist Episcopal Church, Inc., the presiding Bishop of the District, the Chairman and members of the Board of Trustees of the Baltimore Annual Conference of the A.M.E. Church, and the Presiding Elder of the Conference. For convenience, we shall refer only to the A.M.E.

 The petitioner does not agree that any of the trustees of the local church are respondents. It alleges that all of the trustees withdrew from the denomination.

3. The attributes of a "connectional" church were addressed by counsel for the respondent during argument on the motion for summary judgment:

 "It is very important that we understand that the A.M.E. Church is a connectional church so that members of Mt. Olive who are in good and regular standing are also members of an A.M.E. church no matter where."

"Annual Conferences." The A.M.E. publishes its internal governing policies in a handbook entitled *The Doctrine and Discipline of the African Methodist Episcopal Church* (hereinafter, the *"Book of Discipline,"* or the *"Discipline"*), which is updated every four years. Neither the 1888 version of the *Book of Discipline,*[4] the 1972 version, in effect when the sanctuary property was purchased in 1975, nor the 1992 version, in effect when the local church withdrew from affiliation with the A.M.E., addressed the disposition of local church property upon such withdrawal. The 1972 and the 1992 version, however, both contained a provision with respect to the disposition of abandoned property. In addition to the abandoned property provision, the 1972 *Book of Discipline* and 1992 *Book of Discipline* also advised the use of a "Form of Deed," which provided that the local church take title to real property "in the trust for the use . . . of the members of the African Methodist Episcopal Church in the United States of America. . . ." Although both the 1972 *Book of Discipline* and the 1992 *Book of Discipline* contain a provision on the transfer of local property, only the 1992 *Book of Discipline* contains a provision that provides that such property is "held IN TRUST for the African Methodist Episcopal Church, Inc."[5]

---

**4.** Although counsel for the respondent referred, in argument, to an 1892 *Book of Discipline,* which would have been in effect when the local church was incorporated, only the 1888 *Book* has been included in the record. Counsel advised the court that, with respect to the ownership of property, the various books of discipline are the same; "That has never changed."

**5.** That provision, on which the respondent placed considerable reliance in the trial court, states, in its entirety:

"A. *Purchase, Transfer*

"The African Methodist Episcopal Church, Inc. is organized and functions solely as a connectional church. The title(s) to all real, personal and mixed property held at the General, Annual Conference level or by the local churches, shall be held IN TRUST for the African Methodist Episcopal Church, Inc., subject to the provisions of its Discipline.

"However, the absence of a trust clause as indicated herein, in deeds, and documents of conveyances previously executed shall not exclude a local church from or relieve it of its Connectional character and responsibilities to the African Methodist Episcopal Church, Inc.,

On September 16, 1993, the Mt. Olive trustees, congregation, and officers met and decided to withdraw from the A.M.E. Citing a number of reasons, including the burdensome financial demands placed upon it by the A.M.E., the lack of compassion shown by the A.M.E. for its financial condition, and the total decline in the moral conditions in the A.M.E. church, in a written resolution, the signatories, including all the Mt. Olive trustees, averred that the officers and members had "unanimously" voted to withdraw from the conference.

On November 18, 1993, the A.M.E. filed suit against Mt. Olive in the Circuit Court for Wicomico County seeking a declaratory judgment that the A.M.E. was entitled to have title to and control over the Mt. Olive properties. Both parties moved for summary judgment. After two hearings on those motions, the trial court granted the petitioner's motion and denied the respondent's. It subsequently declared that "[a]ll real properties in the name of the Mt. Olive African Methodist Episcopal Church of Fruitland ..., including the improvements advantages and appurtenances thereto, are ... the sole and exclusive property of the local church corporation, to wit, the Mt. Olive African Methodist Episcopal Church of Fruitland, Inc." The court concluded that the A.M.E. had not

---

nor shall the lack of the TRUST phrase excuse or absolve a local congregation, church agency or Board of Trustees of its responsibilities and accountability to the African Methodist Episcopal Church, Inc., provided, the intent and desires of the founders and of the later congregations or Board of Trustees have all demonstrated the following conduct:

"1. Use of the name, customs, polity, or literature of the A.M.E. Church, Inc., in such a manner as to be known as a part of the A.M.E. Church connection.

"2. Conveyance of said property to the trustees of a local church or agency to the A.M.E. Church, Inc.

"3. The acceptance of the pastorate of ministers appointed by a bishop of the Episcopal District or Annual Conference of the A.M.E. Church, Inc.

"4. The payment of conference assessments or dues.

"5. The participation and enrollment of the church as a member of the connection of the A.M.E. Church, Inc., by said local church in the Quarterly Conference and the Annual Conference."

utilized one of the three methods this Court, in *Maryland and Virginia Eldership of Churches of God v. Church of God at Sharpsburg*, 249 Md. 650, 663, 241 A.2d 691, 699 (1968) (*Eldership I* ),[6] stated were available to an hierarchical denomination to maintain control of the local church property in the event the local church withdraws from the affiliation.[7]

The A.M.E. appealed to the Court of Special Appeals. That court reversed the judgment of the circuit court. Assuming that the 1972 *Book of Discipline* was silent on the critical point, providing for the disposition of local church property on the withdrawal of the local church from the denomination, it held, based on Mt. Olive's 1894 corporate charter, specifically the portion hereinabove quoted, that, "apart from the A.M.E. Church Discipline, the certificate of incorporation, standing alone, created a trust relationship between the parent church and the local church, whereby the local property was held in trust, [by the local church,] for the benefit of the former." *Board of Incorporators of African Methodist Episcopal Church, Inc. v. Mt. Olive African Methodist Episcopal Church of Fruitland, Inc.*, 108 Md.App. 551, 584, 672 A.2d 679, 695

---

6. The Supreme Court vacated the judgment in *Maryland and Virginia Eldership of Churches of God v. Church of God at Sharpsburg*, 249 Md. 650, 241 A.2d 691 (1968), and remanded the case to this Court for consideration in light of *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 528, 89 S.Ct. 850, 21 L.Ed.2d 750 (1969). On remand, this Court affirmed its prior holding, 254 Md. 162, 254 A.2d 162 (1969), *aff'd*, 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970).

7. *Eldership I* provided that there are three methods by which a hierarchical denomination may maintain control of local church property:

1. It may require reverter clauses in the deeds to the property of the local churches.

2. It may provide in its constitution or by some other authoritative source for the reverting of the local church property to the hierarchical body upon withdrawal by local congregation with an implied consent by the local church to this provision.

3. It may obtain form the General Assembly an act providing for such a result.

*Id.* at 663, 241 A.2d at 699.

(1996).[8] It also acknowledged the considerable controversy surrounding its meaning and recognized that the charter was far from clear in stating the interest of the A.M.E. in the local church property. Despite the very considerable ambiguity, the intermediate appellate court found dispositive:

"The record is clear that there is only one 'discipline'—that of the A.M.E. Church. Appellees have not introduced a separate 'discipline' governing their local congregation. Nor have they disputed that the term 'discipline' means anything other than the A.M.E. Church's governing constitution, as appellants argue. Additionally, it is undisputed that the only 'proper authorities' with the power of making a 'ministerial appointment' are found in the A.M.E. hierarchy. In this regard, during the hearing before the circuit court, appellees' counsel made it clear to the circuit court that there was no dispute that the local church accepted the pastors and ministers appointed by the A.M.E. Church."[9]

*Id.* at 578, 672 A.2d at 692.

Cognizant of the methods set out in *Eldership I* for a parent church to insure that it maintains control over local church

---

**8.** The intermediate appellate court's focus primarily was on paragraph 5 of the Charter, as indicated. As to it, the court opined:

"Preliminarily, we observe that the meaning of paragraph 5 of the certificate of incorporation is by no means readily apparent. As is demonstrated by the very different interpretations of the parties, it is no easy task to construe paragraph 5. Nonetheless, in the final analysis, we must hold that appellants are correct that paragraph 5 of the certificate of incorporation subjected the trustees to the A.M.E. Discipline and caused the local church property to be held in trust for the A.M.E. Church. We agree with appellant that this is the only reasonable construction of the certificate of incorporation in light of the undisputed facts that the only 'discipline' is that of the A.M.E. Church, and that only the A.M.E. Church—not local A.M.E. member churches—has the power to appoint pastors."

*Board of Incorporators of African Methodist Episcopal Church, Inc. v. Mt. Olive African Methodist Episcopal Church of Fruitland, Inc.*, 108 Md.App. 551, 578–79, 672 A.2d 679, 692–93 (1996).

**9.** It was of no significance that the local church was incorporated fully seven years after it affiliated with the A.M.E., yet, the charter failed to refer to the A.M.E. by its formal or corporate name. Nor did the Court of Special Appeals find particularly persuasive the fact that only one

property, the Court of Special Appeals specifically *did not hold*
that the A.M.E.'s governing documents contained any lan-
guage providing that the local church property would revert to
the parent church should the local church withdraw from the
denomination, or its functional equivalent. *Id.* at 574, 672
A.2d at 690. It concluded, however, that the *Eldership I*
methods were not exclusive, that sources other than the
governing documents, to include the corporate charter, could
be considered when deciding whether property is being held in
trust for the A.M.E. *Id.* at 571, 672 A.2d at 690. The
intermediate appellate court relied on *Babcock Mem. Presby-
terian Church v. Presbytery of Baltimore of the United Pres-
byterian Church,* 296 Md. 573, 464 A.2d 1008 (1983), *cert.
denied,* 465 U.S. 1027, 104 S.Ct. 1287, 79 L.Ed.2d 689 (1984).
It explained:

> "We reject appellees' assertion that in order for a parent
> church to retain control of local church property there
> invariably must be an explicit reverter upon withdrawal
> provision. In *Babcock,* the Court of Appeals noted that, as
> in contrast to the Eldership cases, there was a 'provision
> relative to control of local church property by the parent
> church.' ... Our analysis of that provision indicates that it
> was not an explicit reverter upon withdrawal provision.
> Section 62.12 of the parent church's constitution 'relative to
> control of local church property' provided that a local church
> was forbidden from selling, mortgaging, or otherwise en-
> cumbering its property without the parent church's written
> permission.... It is readily apparent that this is merely a
> general provision relating to control of local property—not

church, the Mt. Olive African Methodist Episcopal Church of Fruitland,
and only one congregation, Mt. Olive, were mentioned. In the absence
of a clear reference to the parent church, it is difficult, to say the least,
to construe the phrase, "said church," in the fifth paragraph of the
charter as referring to any other church than that expressly mentioned,
*i.e.,* the local church. In summary, the meaning of the charter is so
doubtful as to be too tenuous a support on which to find that the local
church consented, even impliedly, to the parent church's ownership
and control of the local church property upon the local church's
withdrawal from the denomination.

an explicit reverter upon withdrawal provision. This provision precluded the local church from giving away its property, as the local church was bound by its bylaws specifically requiring it to follow the mandates of the parent church. . . . Moreover, under the principle that 'a corporation has only such powers as are expressly granted by its charter or by statute and such as may impliedly be derived from its corporate purposes,' the local church was not granted power by its charter to dispose of its property by gift. . . ." (Citations and footnote omitted)

*Id.* at 581, 672 A.2d at 694. Hence, the intermediate appellate court concluded that the provision in the charter "has the same effect and is tantamount to an explicit reverter provision." *Id.* at 582, 672 A.2d at 694.

At the petitioner's request, we granted the writ of certiorari and, for the reasons that follow, we shall reverse the judgment of the Court of Special Appeals.

## II

 In considering the issue in the case *sub judice*, it is well to keep in mind that "the courts, wisely we think, will not enter a 'theological thicket.' " *Eldership I*, 249 Md. at 660, 241 A.2d at 697. Maryland courts, like courts generally in this country, have no authority to resolve religious disputes. *Polen v. Cox*, 259 Md. 25, 31–32, 267 A.2d 201, 204–05 (1970). *See Presbyterian Church in United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). Indeed, in regard to the spiritual or doctrinal affairs of a church or denomination, the Maryland courts must not interfere. "Such matters 'must be left with the authorities of the church or denomination who have the power, by custom and usages of the ecclesiastical organization, to consider and determine upon them.' " *Id.*, (quoting *Shaeffer v. Klee*, 100 Md. 264, 271, 59 A. 850, 852 (1905)).

Thus, the Supreme Court of the United States in *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666, 669 (1872) made

clear that, in this country, we do not follow the English cases finding, in the absence of an express provision to that effect, an implied trust on the part of donors of property to the local church that the trust would be used for the promulgation of the faith and doctrines in effect when the property was given. The Court reasoned that to do so is to become embroiled in a religious dispute; it is wholly inconsistent with the American concept of the relationship between church and state to permit civil courts to determine ecclesiastical questions. *Id.* at 727–729, 20 L.Ed. at 676–677.

■ This does not mean, of course, that the courts may not resolve any issue in which a church or denomination is a party. As the Supreme Court opined in *Presbyterian Church:*

"The First Amendment severely circumscribes the roles that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded. But first amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice."

393 U.S. at 449, 89 S.Ct. at 606, 21 L.Ed.2d at 665. To the contrary, "[w]hen rights of property are involved ... the courts, of necessity, must proceed to consider and adjudicate those rights not only to solve the particular case and the rights of the litigants before them, but also to preserve definiteness and order in the holding of property by religious corporations." *Eldership I,* 249 Md. at 661, 241 A.2d at 697. As Chief Judge Gilbert put it for the Court of Special Appeals,

"The 'wall of separation' does not mean that courts have been stripped of all power to inquire into disputes arising among church members. Indeed, '[t]he state has a legiti-

mate interest in keeping title and ownership in land settled and secure.' The State's interest in the protection of its citizenry necessitates that it know 'at all times the owners of property within its borders, so that in the event one is injured on that property, the owner may be readily located.' Moreover, the State is cognizant of the words of Sir Henry Wotton (1568–1639) that '[t]he itch of disputing will prove the scab of churches,' and it affords the disputants a forum for 'some recourse other than the sword for settling their disputes....'"

*Calvary Presbyterian Church of Baltimore City v. Presbytery of Baltimore of United Presbyterian Church in the U.S.,* 39 Md.App. 405, 406, 386 A.2d 357, 358 (1978), (quoting *Judicial Intervention in Church Property Disputes,* 74 Yale L.J. 1113, 1130 (1965)). "The relevant inquiry must be whether the court can resolve the property dispute on the basis of neutral principles of law which do not involve the resolution by the court of ecclesiastical issues. Thus in the present case, it does seem that the underlying source of the controversy stems from the mother church's assignment of clergy to the position of overseer and the decision to abolish the bifurcated church structure. However, as long as the court does not have to resolve the doctrinal propriety of these changes in order to determine who has legal control of the property, there is no unconstitutional intervention by the state in church affairs." *Polen,* 259 Md. at 30, 267 A.2d at 204. *See Maryland and Virginia Eldership of Churches of God v. Church of God at Sharpsburg, Inc.,* 254 Md. 162, 165, 254 A.2d 162, 165 (1969); *aff'd,* 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970) (*Eldership II* ). *See* also *Calvary Presbyterian Church of Baltimore City v. The Presbytery of Baltimore of United Presbyterian Church in U.S.,* 39 Md.App. at 417, 386 A.2d at 364, in which the intermediate appellate court declared:

"We do not read *Watson* as proscribing all inquiry by a court of church disputes, but only those dealing with 'questions of discipline, or of faith, or ecclesiastical rule, custom, or law....' Were it otherwise, controversies such as in the case *sub judice* might never be resolved, and the title to the

church property would be enmeshed in a quagmire from which extrication would be nearly impossible. Title to property cannot be allowed to drift about in an atmosphere of uncertainty. It must be vested in someone.... 'and in such force, that an injury to the possession can be redressed by an action at law.' Neither *Watson* nor the First Amendment condemn the courts' deciding ownership of church property, so long as the relevant inquiry is whether the question can be decided 'on the basis of neutral principles of law which do not involve the resolution by the court of ecclesiastical issues,' or doctrinal proprieties," (footnote omitted.)

(Quoting *Watson,* 80 U.S. at 727, 20 L.Ed. at 676; *Georges Creek Coal and Iron Co.'s Lessee v. Detmold,* 1 Md. 225, 238 (1851); *Polen,* 259 Md. at 30, 267 A.2d at 204;).

### III

 Mt. Olive was incorporated under the general provisions of the Religious Corporations Law. Consequently, the consideration of whether, in this case, the property of the local church is controlled by trustees representing the majority of the congregation of the local church must begin with an analysis of that law. Such an analysis was conducted by our predecessors in *Eldership I:*

"The present law provides in effect that in every church, religious society or corporation of whatever sect or denomination 'protected in the free and full exercise of its religion by the Constitution and laws' of the State there shall be power and authority in all persons above 21 years of age belonging to 'any such church, society or congregation' to elect certain persons, not less than four nor more than twenty-five, who when elected 'shall be constituted a body politic or corporate to act as trustees in the name of the particular church, society or congregation for which they are respectively chosen, and manage the estate, property, interest and inheritance of the same.' By the provisions of Section 257, the trustees are given perpetual succession by their name of incorporation and very broad powers in

regard to the corporate property. The trustees may purchase and hold the property and 'use or lease, mortgage or sell and convey the same, in such manner as they may judge most conducive to the interest of their respective churches, societies or congregations,' with a provision that they shall not sell, mortgage or dispose of property held by the corporation under an instrument prohibiting such sale. There are provisions for election of trustees, how their succession is maintained, with a provision that the minister or senior minister shall be a member of the corporation, ex officio, as well as provisions for the arbitration of contested elections, provisions for the adoption of a plan, agreement or regulation at the first election of trustees, its acknowledgment and entry in a book required to be kept, the recording of the plan, agreement or regulation with the Department of Assessment and Taxation and the procedure for amendment."

*Eldership I*, 249 Md. at 657, 241 A.2d at 695–96. That analysis is as valid today as it was when made. Just as "[t]he ... General Religious Corporation Law [in effect when *Eldership I* was decided was] based upon and largely follow[ed] the original legislation on this subject, *i.e.*, the Act of 1802, chapter 111," *id.*, so too is the present version based upon and largely follows Maryland Code (1957, 1993 Repl.Vol.) Art. 23, §§ 256 to 270. *See Babcock*, 296 Md. at 578, 464 A.2d at 1011.

This applies as well to the conclusion the Court drew from the analysis:

"It is clear that when a congregation is incorporated under the General Religious Law applicable to all religious groups, the trustees and the local congregation own and control the property of the local church.[10] There is no provision in the

---

**10.** *Babcock*, 296 Md. at 583, 464 A.2d at 1014; *Hayman v. St. Martin's Evangelical Lutheran Church*, 227 Md. 338, 346–347, 176 A.2d 772, 776–777 (1962); *Evans v. Shiloh Baptist Church*, 196 Md. 543, 551, 77 A.2d 160, 163 (1950); *Phillips v. Insley*, 113 Md. 341, 347, 77 A. 850, 852 (1910); *Shaeffer v. Klee*, 100 Md. 264, 271, 59 A. 850, 852 (1905); *Stubbs v. Vestry of St. John's Church*, 96 Md. 267, 278, 53 A. 917, 919 (1903); *see African Methodist Bethel Church v. Carmack*, 2 Md.Ch. 143,

General Religious Law that the local congregation conform to or follow any particular religious tenet or doctrine and it is apparent that it would be inappropriate for the General Assembly to have made such a provision. In short, the General Religious Law is concerned with the ownership, use and disposition of property, not with any religious theories, doctrines or tenets.[11] So far as the Maryland statutory law is concerned, there seems little doubt that the trustees and congregations of the local churches are entitled to own, use and control the property of the respective corporations." 249 Md. at 658, 241 A.2d at 696. Maryland law thus is clear. The general provisions of the Religious Corporations law place the control of local church property in the hands of the trustees. As *Eldership II* put it, "By the nature of the law in regard to the formation of corporations generally, the religious corporation formed under it is controlled by trustees elected by the local membership. This is true of all member corporations." 254 Md. at 174, 254 A.2d at 169. In other words, Maryland law contemplates a congregational form of church government.[12]

---

144 (1849), ("I think it, therefore, very clear, that the trustees and not the members of the congregation constitute the corporate body").

**11.** *Maryland & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 254 Md. 162, 254 A.2d 162 (1969), *aff'd*, 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970). *See Smith v. Church of God*, 326 F.Supp. 6, 8–9 (D.Md.1971).

**12.** *Eldership I* noted that:
"At least three kinds of internal structure, of 'polity,' may be discerned; congregational, presbyterial, and episcopal. In the congregational form, each local congregation is self-governing. The presbyterial polities are representative, authority being exercised by laymen and ministers organized in an ascending succession of judicatories-presbytery over the session of the local church, synod over presbytery, and general assembly over all. In the episcopal form power reposes in clerical superiors, such as bishops. Roughly, presbyterial and episcopal polities may be considered hierarchical, as opposed to congregational polities, in which the autonomy of the local congregation is the central principle." (Footnotes omitted).
249 Md. at 662, 241 A.2d at 698, quoting Note, 75 Harv.L.Rev., at 1143–4. Mr. Justice Miller, in *Watson v. Jones*, 80 U.S. (13 Wall.) at

▮▮▮▮ Maryland law does not, however, mandate that ownership and control remain perpetually with the trustees. In the event that the local church disassociates itself from the denomination or parent church, to be sure, a question may arise as to whether the control of the local church's property reverts to the denomination or parent church or remains in the control of the local church. Indeed, we addressed just such a circumstance in *Eldership I,* proffering three ways in which hierarchical denominations may insure that they maintain control over local church property: 1. requiring the local churches to place reverter clauses in the deeds to its property; 2. providing in their constitutions or other authoritative sources for the reversion of local church property upon the withdrawal by a local congregation, with an implied consent by the local church to the reversion provision; 3. obtaining from the General Assembly an Act providing for that result. 249 Md. at 663, 241 A.2d at 699. Moreover, we have recognized that a Maryland religious corporation, acting on its own and not by virtue of the Religious Corporations Law, may adopt a

---

713, 722–723, 20 L.Ed. 666, 670 (1872), identified three situations in which property held by religious groups have been the subject of actions in the civil courts. The third, "where the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of that general organization," encompasses those cases in which an hierarchal denomination is a party. As to that class of cases, relying on *Gonzalez v. Roman Catholic Archbishop,* 280 U.S. 1, 16, 50 S.Ct. 5, 7, 74 L.Ed. 131, 136 (1929), in which Mr. Justice Brandeis stated,

"In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise[,]"

this Court observed that the Supreme Court seems to indicate that there must be an element of fairness in the decisions of the church tribunals. *Eldership,* 249 Md. at 661–62, 241 A.2d 691, 697–698 (1968). In this case, it is undisputed that the local church and not the parent church purchased the properties at issue and that the parent church did not contribute thereto. Consequently, should the property be determined to remain under local control, there would appear to be no unfairness.

presbyterial or episcopal polity and, thus, may provide for the holding of the local church property subject to the provisions of the constitution, charter or by-laws of the denomination and the action of the authoritative agencies of such denomination. *Id.* at 174–75, 254 A.2d at 170. *See* also *Babcock,* 296 Md. at 579, 464 A.2d at 1012 (local church by-law providing, "This church is affiliated with the United Presbyterian Church in the United States of America and is under the care of and subject to the jurisdiction of the Presbytery of Baltimore. These By–Laws shall be subordinate to the Constitution of the United Presbyterian Church and nothing contained herein shall be interpreted to the contrary," was a contract adopting a presbyterial polity, thus giving the parent church an interest in the local church property); *Polen v. Cox,* 259 Md. at 36, 267 A.2d at 207 (local church's implied consent to the provisions of the Minutes of the mother church can be inferred from the relationship between the mother church and the local church).

The two *Eldership* cases make clear that the nature, extent, and consequences of an affiliation are also matters to be determined by the trustees and the congregation, in conjunction with the denomination or parent church with which the local church chooses to affiliate. They recognize, consistent with the Religious Corporations Law, that the determination ordinarily will be made as a matter of contract. Thus, in *Eldership I,* this Court made the point that

"Maryland provides for incorporation of local congregations under the General Religious Law and if the control of the local church property by the local trustees is not modified by contract-express or implied-or otherwise, the provisions of the local charters and by-laws govern the ownership and control of the local church property and corporation."

249 Md. at 672, 241 A.2d at 704. We reiterated the point in *Eldership II,* where we said:

"As we observed, the denomination in its Constitution may so provide, but in the absence of such a provision there is no 'contract' between the local church corporation and the parent body, which changes the provisions of the deeds and

charters of the local church corporations giving the local church corporation complete legal title, possession and the right to convey or use the local property as the local church corporation deems best."

254 Md. at 176, 254 A.2d at 170.

When resolving issues involving the ownership or control of church property, it generally is important, as well as prudent, in the absence of express language in the deed conveying the property, to consider the "polity" or the form of church government of the particular denomination. *Eldership*, 249 Md. at 662, 241 A.2d at 698. The determination that it is hierarchal in nature does not, however, end the inquiry, for the form of church governance simply may not be dispositive. This is so because "[a] denomination need not adhere strictly to any one of the three polities mentioned-episcopal, presbyterial or congregational. It may avail itself of parts of one, two or even all three." *Id.* at 663, 241 A.2d at 699. In fact, that a particular denomination has characteristics of one form of polity does not preclude it from sharing characteristics with the others. *Id.* at 664, 241 A.2d at 699. And, of course, an hierarchal form of government does not mean that the use and control of church property may not be subject to a congregational polity. *Id.*

*Eldership I* is illustrative of the latter point. Although itself hierarchal in nature, the constitution of the General Eldership of the Church of God was silent on the issue of the ownership and control of local church property, although it recommended deeding such property to trustees to be held in trust for the church and the insertion in the deeds of provisions providing for the reversion of the property to the appropriate annual eldership in the event of the church's becoming extinct or failing to remain doctrinally compatible. *Id.* In addition, the annual elderships' constitution provided for reversion only in the event of extinction or cessation and the local charter of one of the local churches expressly stated that affiliation with a larger denomination would have no effect on its ownership and control of its property. *Id.* at 665–66,

241 A.2d at 700. It was to the Court, therefore, "plain that it was never contemplated that the property of the local churches should be subject to the control of the Eldership." *Eldership II,* 254 Md. at 170, 254 A.2d at 168. *See Hayman v. St. Martin's Evangelical Lutheran Church,* 227 Md. 338, 176 A.2d 772 (1962), cited in *Eldership I,* 249 Md. at 671, 241 A.2d at 703, for the proposition,

> "[E]ven though a denomination may generally have a presbyterial polity, its relationship with a local congregation in regard to the property of that congregation may be on the basis of a congregational polity, and, further, if the by-laws of the parent body are not inconsistent with the provisions of the charter and by-laws of the local congregation providing for the control by the local congregation over its property, a minority of the congregation, although reorganized as the 'congregation' by the parent body, is not entitled to the property of the local congregation and to control the local corporation."

*Babcock* and *Polen* are examples of hierarchal denominations utilizing one of the accepted methods to maintain ownership and control of local church property. In *Babcock,* the parent church's constitution prohibited the sale, mortgage or encumbrance of local church property without the consent of the Presbytery. *Babcock,* 296 Md. at 580, 464 A.2d at 1012. It was the Minutes of the General Assembly of the parent Church in *Polen* that provided the mechanism for the, control of the property at issue in that case. Establishing the hierarchal nature of the denomination and rendering the autonomy of local churches virtually non-existent, they provided: "the right of any local church as a whole to withdraw from the General Assembly is not recognized and does not exist but those members who prove disloyal to the government and teachings as promulgated from time to time by the General Assembly, or who are otherwise disorderly are to be dealt with as individuals." 259 Md. at 34, 267 A.2d at 206. These cases demonstrate, however, that it is not enough to establish the relevant authoritative source on which the claimed right to control is based; it is also necessary that there be provided

evidence of the consent of the local church to that provision. The consent may be express, *see Babcock,* or implied, *see Polen;* the existence of a relationship that, by its nature, would support parent church control may not be sufficient. In *Babcock,* the consent was supplied by the local church's charter, which declared that it should "forever remain a Presbyterian Church in accordance with the Standards of the Presbyterian Church of the United States," 296 Md. at 577, 464 A.2d at 1011, and a by-law of the local church that stated that

> "This church is affiliated with the United Presbyterian Church in the United States of America and is under the care of and subject to the jurisdiction of the Presbytery of Baltimore. These By–Laws shall be subordinate to the Constitution of the United Presbyterian Church and nothing contained herein shall be interpreted to the contrary."

*Id.* at 579, 464 A.2d at 1013. In *Polen,* the local church's consent to the provision in the Minutes was implied and was inferred from the relationship between the parent church and the local congregation. 259 Md. at 36, 267 A.2d at 207. *See Calvary Presbyterian Church of Baltimore City v. Presbytery of Baltimore of United Presbyterian Church in U.S.,* 39 Md.App. at 420, 386 A.2d at 365 ("We think it apparent that Calvary holds title to its physical property for the benefit of United. 'The Form of Government' manifests that all church property is owned by United. When Calvary became associated with United's predecessor, which association continued with United, it did so with the clear understanding that the Calvary church buildings became and continue to be the property of United. Moreover, lest there be any lingering doubt, the Legislature has eradicated it by virtue of Md. Corp. & Ass'ns Code Ann. § 5–331(a) (Cum.Supp.1977)"[13]).

---

**13.** That section provided, and still provides:

"Certain charters deemed amended. To the extent not prohibited by the Constitution of the United States or of this State, the charter of each religious corporation subject to this part and incorporated before June 1, 1957, is deemed to be amended to conform to the constitution of the United Presbyterian Church in the United States of America and its successors, as from time to time in effect."

■■■■■■■■■■■■■■■■
■■■■■■■■■■

Thus, it is clear that the resolution of church property disputes demand an analysis that involves the review of all relevant documents and circumstances. Unless the deed to the property clearly provides for the holding of the property in trust for the parent church, it is not enough to consider simply the form of the church government, the constitution or other authoritative sources pertinent to the parent church's claim to the property, consideration must also be given to the Religious Corporations Law, the relations between the parties, and the local church charter. The latter at the very least provides insight into the relations between the parties and may evidence the local church's consent to the form of government and to be bound by provisions in the parent church's constitution or other authoritative sources pertaining to the ownership and control of its property. Indeed, it was on this source that the Court of Special Appeals placed decisive weight.

## IV

■■ This case was decided on summary judgment. In entering summary judgment in favor of the petitioner, the trial court considered and thus relied on two classes of evidence, the deeds to the sanctuary and parsonage properties and the 1972 A.M.E. *Book of Discipline.* In its oral opinion delivered from the bench, the court acknowledged the requirement that it apply "neutral principles" to the resolution of the church property dispute and found that the A.M.E. Church is an hierarchical church. Then, with regard to the deeds to the property, it stated:

"The principal piece of property involved in this case was acquired in 1972. Other property involved was acquired at a much earlier era. There is no question that the local church has had a very long affiliation with the A.M.E. Church. However, there, in applying neutral principles of law as the ownership of real property, the first place the Court must look is to the deeds of the property. The deeds to the property convey the property to the local corporation.

"It is an outright conveyance of property. There is no trust language in the deeds. There is no reverter clause in the deeds that would have the property reverted to the parent corporation in the event that the local Assembly decided in their majority provisions to withdraw from the A.M.E. Church."

After setting out the three accepted methods *Eldership I* prescribed for an hierarchical denomination to maintain control over local church property and concluding that the parent church did not do any one of the accepted methods, the court addressed the 1972 A.M.E. *Book of Discipline.* As to it, the court observed:

"The 1972 *Discipline* that was in effect at the time of the acquisition of the property, of the principal piece of property involved in this proceeding, upon my review of it, has no provisions for the property being held in trust or any reversion or anything of that nature.

"It does provide for a form of deed to be used if the property is to be transferred in trust for the principal corporation, a form of deed that was not used in the original acquisition of property back in the 1890's."

The Court of Special Appeals, and the respondent too, for that matter, agreed with the court with regard to the deeds; in fact, the intermediate appellate court acknowledged that

"these deeds indicates that neither deed contains a reverter provision whereby the property would revert to the A.M.E. Church upon the local church's separation from the A.M.E. Church. Nor is there any language remotely indicating such an intent. Indeed, the A.M.E. Church is not mentioned in these deeds.... Under the above-outlined case law, if the deeds were the only source for our consideration, therefore, we would be inclined to conclude that appellees retained the property upon their withdrawal."

108 Md.App. at 574, 672 A.2d at 691. Then, "assuming without deciding," the correctness of the court's determination that the 1972 A.M.E. *Book of Discipline* contained "no provisions for the property being held in trust or any reversion or

anything of that nature," the Court of Special Appeals proceeded to hold, based solely on a provision in the local church's 1894 certificate of incorporation, that the petitioners "are not entitled to retain control of the property after departing from the A.M.E. denomination, even if the 1972 *Discipline* is silent on the issue." *Id.* at 576, 672 A.2d at 691. It faulted the trial court both for failing to consider that document and for failing "to recognize [its] controlling implications." *Id.*

As we have seen, the trial court granted the petitioner summary judgment, and presumably denied the respondent's motion, on two grounds, the absence of trust language in the deeds to the church property and the failure of the 1972 *Book of Discipline* to provide for the reversion of the church's property in the event of the local church's withdrawal from the denomination; its ruling very clearly was not based on an interpretation of the local church charter.

■ It is well settled in this State that "[o]rdinarily a motion for summary judgment may be upheld only on the grounds relied upon by the hearing court." *Gross v. Sussex Inc.,* 332 Md. 247, 276, 630 A.2d 1156, 1170 (1993) and cases cited. Stated otherwise "the appellate court will not ordinarily undertake to sustain the judgment by ruling on another ground, not ruled upon by the trial court, if the alternative ground is one as to which the trial court had a discretion to deny summary judgment." *Three Garden Village Ltd. Partnership v. U.S. Fid. & Guaranty Co.,* 318 Md. 98, 108, 567 A.2d 85, 89 (1989), citing *Geisz v. Greater Baltimore Medical Center,* 313 Md. 301, 314 n. 5, 545 A.2d 658, 664 n. 5 (1988). See *Henley v. Prince George's County,* 305 Md. 320, 333, 503 A.2d 1333, 1339–40 (1986); *Metropolitan Mortgage Fund, Inc. v. Basiliko,* 288 Md. 25, 27–29, 415 A.2d 582, 583–84 (1980). The corollary to this rule, applicable to this case, is:

"The foregoing proposition also means that we do not review the denial of summary judgment for [the respondent] and do not evaluate all of the reasons advanced by [the respondent] for granting it summary judgment. Simply because summary judgment for petitioners was properly

reversed, it does not follow that we can say that [the respondent]'s motion was improperly denied. Even if the record before the circuit court at the time of [the respondent]'s motion would have supported summary judgment for [the respondent], the trial court's discretion to deny or defer ruling ordinarily prevents an appellate court from directing that summary judgment be granted. Without abusing its discretion, a trial court may decide, for example, that a party should be allowed a further opportunity to develop facts or to explore an alternate theory of claim or defense."
*Three Garden Village,* 318 Md. at 108, 567 A.2d at 90. Consequently, unless we conclude that the trial court was legally correct in granting summary judgment in favor of the petitioner, *see Federated Dep't Stores, Inc. v. Thach Le,* 324 Md. 71, 79, 595 A.2d 1067 (1991); *Heat and Power Corp. v. Air Prods. & Chems. Inc.,* 320 Md. 584, 591–92, 578 A.2d 1202, 1206 (1990), this case will have to be remanded for further proceedings.

We are satisfied that the trial court was legally correct. To make that determination, we place the trial court's ruling in context by reviewing the arguments the respondent made to it. To be sure, the respondent advocated "a non-doctrinal inspection of certain documents," including the deeds to the property, the Articles of Incorporation of Mt. Olive, and the constitution of the parent denomination relating to the ownership of church property. The major thrust of its argument, however, was that the A.M.E. Discipline that mandates a result in its favor. Thus, after referencing section 5 of the Articles of Incorporation, the respondent emphasized the A.M.E.'s *Book of Discipline,* noting that, when the local church was incorporated, it required "the local trustees . . . to guard the property for the people of the connection" and that responsibility continues under the then most recent *Discipline,* 1992, upon which it particularly relied and proffered as applicable to the resolution of the case *sub judice.* Proceeding on that assumption, the respondent then argued:

"... if you look at the deed, there is not a question about whether or not this property should belong to the African

Methodist Episcopal Church because under the church law even if there is not a trust provision or a reverter in the deed, as long as the Board of Trustees does one of several limited things, then they are still considered under the church law to hold the property in trust for the church.

"This is to say, if they use the name. A.M.E., if they use the polity, A.M.E., that is the system of government. It is a hierarchical church, if they are known as a part of the A.M.E. connection, if there is any conveyance of the property to the Trustees of the A.M.E. church, if the church accepts the pastors who are appointed by the Bishop, if the church pays conference assessments or dues, and if the church participates and enrolls as the member of the Quarterly conference and the annual conference, all of which comprise the A.M.E. Church.

"We are answering that Mt. Olive for 99 years, since 1892, Mt. Olive has answered the roll call. Mt. Olive has participated in annual conferences, in Sunday school conferences, in district conferences and in general conferences.

"Mt. Olive has been known as an A.M.E. church and ... when a local church affiliates with a parent body, then that local church may be impliedly deemed to agree and abide by the rules."

The respondent's reliance on the church doctrine is stated more clearly during the second day of argument. Responding to the petitioner's arguments, it said:

"We agree that there is no mention in the deed of a reverter provision, and we agree that there is no mention of African Methodist Episcopal Church in the deed.

"However, our position is that the issue is controll[ed] by the Discipline of the Church. The Discipline provides that trustees hold the property in trust."

At yet another point in the argument, the respondent states its position once again:

"So what our position is, Your Honor, is that from the very first moment of joining the church when members are

received into membership, there is this question: Will you cheerfully be governed by the Discipline?

"That question goes back at least to the 1864 Discipline. . . .

"That question comes all the way up through today.

"So our position is not just that we are claiming this property because we are a hierarchical church but because the members agree to be bound by the rules of that church. The rules of the church, African Methodist Episcopal Church are found in its disciplines, which basically if you look at these, Your Honor, they come down basically unchanged all the way through the years regarding property matters which are in dispute here today."

The reference to the Articles of Incorporation must be viewed in the same context. After the petitioner suggested that there might be a dispute of material fact as to the meaning of the phrase "such church" as used in section 5, whether it referred to the hierarchy or to the local church, the respondent clarified, "I agreed [sic] that the reference to the use of ministry and membership of said church refers to the local church. My position is that the local trustees of the local church are to have their powers and duties in subjection to the *Discipline.* That is the point I was making. . . . My reference was that whatever they did in the local church, it was to be in subjection to the *Discipline.*" Later, the respondent contended "that there is language in section five of the 1894 Charter incorporating the African Methodist Church of Fruitland which subjects the powers and authorities of the trustees to the A.M.E. *Discipline.*"

It is clear that the trial court was not presented with the argument that carried the day in the appellate court. More to the point, the court was essentially asked to choose between the 1972 *Discipline* and others that it mirrored and the 1992 *Discipline* containing the newly added trust language and it did so. The Court of Special Appeals did not hold that the 1992 *Discipline* is applicable or that the court misconstrued the 1972 *Discipline.* Rather, it faulted the trial court for not having addressed a ground that was not presented to it.

Certainly, the court did not say that the charter was irrelevant, nor did it suggest that it would not have considered the charter had it determined that the *Discipline* made provision for the parent church's control of the subject local church property.[14] Accordingly, there simply is no basis for reversing the trial court; it was, and is, legally correct.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENTS.

---

**14.** The charter is, on the one hand, a relevant document which must be considered when there is a question raised as to the adequacy of the proof that the parent church has acted, consistent with its form of church government, to maintain ownership or control over local church property and, therefore, the local congregation's consent to the parent church's hegemony in that regard must be shown. Where, on the other hand, there is no evidence of the parent church having so acted, its constitution and other authoritative documents being silent on the critical issue, the deed to the property lacking any indication of its interest, and there being no legislation to bridge the gap, the relevance of the charter is at best marginal. In that circumstance, where the only evidence is essentially the form of church government, which as we have seen is hardly dispositive, without more, nothing less than the clearest statement of intention that the parent church own and control property deeded to the local church, which also paid for it, will suffice. The office of the charter, in short, ordinarily, is to provide evidence of the local church's consent to be bound by the parent church's polity.