964 A.2d 215

**FROM THE HEART CHURCH MINISTRIES, INC., et al.**

v.

**PHILADELPHIA–BALTIMORE ANNUAL CONFERENCE, et al.**

**Nos. 2546, 2547, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Jan. 28, 2009.

12

Philip W. Horton (Amy L. McGinnis, Arnold & Porter, LLP of Washington, D.C. and Clarissa W. Cook, Gloria J. Harris, From the Heart Church Ministries, Inc of Temple Hills, on the brief), for appellant.

Thomas L. McCally (Tina L. Maiolo, Carr Maloney, PC on the brief) and Thomas E. Starnes (Andrews Kurth LLP on the brief) Washington, DC (John L. Walker of Landover, and James E. Ferguson, II, Ferguson, Stein, Wallas, Adkins, Gresham & Sumter PA of Charlotte, NC) on the brief, for appellee.

Argued before MEREDITH, WOODWARD and JAMES A. KENNEY, III, (Retired, Specially Assigned), JJ.

WOODWARD, J.

This appeal arises from a dispute involving a local church, From the Heart Church Ministries, Inc. ("From the Heart"), and its founding pastor, Pastor John A. Cherry, on one side, and its former denomination, the African Methodist Episcopal Zion Church ("A.M.E.Zion"), on the other side, over the ownership of real and personal property upon From the Heart's withdrawal from A.M.E. Zion. This case was previously before the Court of Appeals in *From the Heart Church Ministries, Inc. v. African Methodist Episcopal Zion Church*, 370 Md. 152, 803 A.2d 548 (2002) (*"From the Heart "*), in which case the Court reversed a grant of summary judgment in A.M.E. Zion's favor and remanded for further proceedings. On December 6, 2006, the Circuit Court for Prince George's County, on remand from the Court of Appeals, entered summary judgment awarding all real property to A.M.E. Zion and all personal property to From the Heart. Appellants/cross-appellees, From the Heart and Pastor Cherry,[1] appeal as to the real property, presenting three questions for our review,[2] which we have consolidated and rephrased:

> Did the trial court err in granting A.M.E. Zion summary judgment as to the real property?

On cross appeal, appellees/cross-appellants, A.M.E. Zion and others,[3] appeal as to the personal property, presenting

---

1. Appellants/cross-appellees will be referred to collectively as "From the Heart," unless otherwise indicated.

2. From the Heart presented the following three questions on appeal:

 (1) Did the Circuit Court misinterpret and/or misapply the test for church property disputes set forth by the Court of Appeals in *From the Heart?*
 (2) Did the Circuit Court err in ruling—contrary to the Court of Appeal's explicit holding in *From the Heart*—that a trust may be revoked only if the grantor expressly reserves the power to revoke?
 (3) Did the Circuit Court err in failing to consider From the Heart's claims of equitable estoppel and waiver?

3. The other appellees to this action are the Philadelphia–Baltimore Annual Conference of the African Methodist Episcopal Zion Church and

four questions for our review,[4] which we have consolidated and rephrased:

> Did the trial court err in granting From the Heart summary judgment as to the personal property?

## BACKGROUND

### A.

### *From the Heart*

Although the instant action is before this Court for the first time, the Court of Appeals previously heard this case on appeal by its own motion in *From the Heart.* For the purposes of consistency and convenience, we adopt and incorporate substantial portions of the factual and procedural history as set forth by Chief Judge Bell of the Court of Appeals in *From the Heart.*

On May 2, 1983, From the Heart was originally incorporated under Maryland Religious Corporations Law as Full Gospel A.M.E. Zion Church, Inc. ("Full Gospel I"). *From the Heart,* 370 Md. at 158, 803 A.2d 548 (citing Md.Code, § 5–304 of the Corporations & Associations Article (1975, 2007 Repl.

---

Full Gospel African Methodist Episcopal Church. They are included in any further reference to "A.M.E. Zion."

**4.** On cross-appeal, A.M.E. Zion presented the following four questions:

(1) Was the Circuit Court legally correct in determining that there is no genuine dispute that Full Gospel's real property was impressed with a trust in A[.]M[.]E[.] Zion's favor as and when [From the Heart] acquired it?

(2) Was the Circuit Court legally correct in determining that the trust in A[.]M[.]E[.] Zion's favor was irrevocable as a matter of longstanding Maryland law?

(3) Was the Circuit Court legally correct in rejecting [From the Heart's] waiver and estoppel defenses?

(4) Did the Circuit Court err in awarding Full Gospel's personal property to [From the Heart], given (a) that the undisputed facts demonstrate that [From the Heart] cannot lawfully stand as the corporate successor of Full Gospel, or (b) in the alternative, that a genuine dispute of material fact exists as to whether Full Gospel held its personal property, not merely its real property, subject to a trust in favor of A[.]M[.]E[.] Zion?

Vol.)). When From the Heart *withdrew from the denomina-*
tion, the church's name was changed was from Full Gospel I
to From the Heart, and the members who did not agree with
From the Heart's withdrawal incorporated themselves as Full
Gospel A.M.E. Zion ("Full Gospel II").[5]

We begin where the Court of Appeals began in *From the
Heart:*

> From the Heart ... was organized in Marlow Heights,
> Maryland in 1981, as an affiliate of [A.M.E. Zion]. ... It was
> organized by Reverend Doctor John A. Cherry, ... its
> pastor, to whom A.M.E. Zion had given a Pastor's Certifi-
> cate of Appointment and whom it had reappointed to that
> position for every term thereafter until the withdrawal, and
> the church's 24 members. On May 2, 1983, trustees, who
> had been elected by the congregation a year earlier, formal-
> ly incorporated the church under the Maryland Religious
> Corporations Law, *see* § 5-304, as Full Gospel [I]. Its
> purpose, as stated in the Articles of Incorporation ("char-
> ter"), was:
>
>> To conduct a church for Christian religious purposes and
>> to perform all necessary and allowable activities in con-
>> nection therewith or incidental thereto, and to engage in
>> any other lawful activity in accordance with the Disci-
>> plines of the African Methodist Episcopal Zion Church.
>> To do anything permitted by Subtitle 3 of Title 5 of the
>> Corporations and Associations Article of the Annotated
>> Code of Maryland, the Religious Corporations law.
>
> Shortly after its incorporation, Full Gospel [I], on May 13,
> 1983, purchased "for use in its growing ministry" property
> located at 5311 St. Barnabas Road in Oxen Hill, Maryland.
> The deed to that property listed as owner Full Gospel

---

5. Full Gospel II "contends that it remains the congregation established
in 1981, albeit much reduced in numbers, and continues a member of
the A.M.E. Zion Church." *From the Heart,* 370 Md. at 159 n. 2, 803
A.2d 548. Full Gospel II "maintains that it is 'entitled to ensure that the
property their contributions helped to acquire remains subject to the
congregation's pledge to hold the property in trust for the good of the
entire denomination.'" *Id.*

A.M.E. Zion Church, Inc., a Maryland Religious Corpora-
tion. Full Gospel [I] subsequently acquired additional, adja-
cent property, which it also took in its name alone, and,
between 1988 and 1999, other real and personal properties,
which were similarly titled. None of the deeds to the real
properties, nor the documents reflecting ownership of any of
the personal property, moreover, contained a clause creat-
ing a trust in favor of, or providing for reversion to, A.M.E.
Zion, which did not make any direct financial contribution to
the purchase of any of the property.

In 1991, Full Gospel [I]'s Board of Trustees adopted
church By-laws and amended its Articles of Incorporation.
The By-laws broadened Full Gospel [I]'s purpose, stating
that it "is to conduct a church for Christian religious
activities," as contrasted with the requirement to act "in
accordance with the Discipline of the African Methodist
Episcopal Zion Church." Pursuant to the By-laws, more-
over, the trustees were vested with full control of Full
Gospel [I]'s church property. The By-laws provided that, in
furtherance of the church's purpose:

> [T]he Corporation may receive property by gift, devise or
> bequest, invest and reinvest the same and apply the
> income and principal thereof, as the Board of Trustees
> may from time to time determine, either directly or
> through contributions through any charitable organization
> or organizations, exclusively for religious, charitable, and
> educational purposes, and engage in any lawful act or
> activity for which corporations may be organized under
> the general laws of the State of Maryland.

> In furtherance of its corporate purposes, the Corporation
> shall have all the general powers enumerated in Section
> 2–103 of the Maryland General Corporation Law as now
> in effect or as may hereafter be amended.

The [1991] amendment of the Articles of Incorporation
deleted all reference to the A.M.E. Zion denomination. In
addition to the same broad statement of purpose as in the
By-laws, the amended Articles addressed specifically the

disposition of church property on the dissolution of the corporation. As amended, the Articles provided:

> In the event of dissolution or final liquidation of the Corporation, all remaining assets of the Corporation [the church] shall ... be distributed to such organization or organizations organized and operated exclusively for religious, or charitable, or educational purposes as shall at the time qualify as an exempt organization or organizations ... as the Board of Trustees shall determine.

Full Gospel [I] amended its Articles of Incorporation again on June 15, 1998. This amendment adopted the church's present name, From The Heart ..., and provided, consistent with its By-laws, that the church would have all of the general powers of a Maryland corporation, as enumerated in § 2–103 of the Corporations & Associations. Article. The 1998 charter amendment, like the predecessor 1991 amendment did with respect to Full Gospel [I], also expressly authorized From The Heart to distribute its assets and property, upon dissolution or final liquidation, to such charitable organizations as its Board of Trustees should determine. Moreover, the 1998 amendment gave the Board of Trustees full power to act on behalf of the church and to conduct any business matters of the church, to adopt By-laws for the church, and to amend, or promulgate new, Articles of Incorporation for the church.

### B.

The A.M.E. Zion Church, founded in 1898, is a religious denomination, international in scope, made up of affiliated churches. [Its] organizational structure is hierarchical, although the church itself characterizes it as "connectional." Under this structure, the affiliated local churches report to one of twelve bishops, who in turn report, quadrennially, every four years, to the General Conference, the governing body of A.M.E. Zion. Comprised of clergy and lay delegates from around the world, the responsibilities of the General Conference include revising the *Book of Discipline of the African Methodist Episcopalian Zion Church*, A.M.E.

Zion's governing policies. Between sessions of the General Conference, A.M.E. Zion is governed by its bishops, who also oversee the various Annual Conferences, which meet yearly to address concerns of the clergy and laity located within the various regions into which the administration of the church is divided.

The rules and regulations of the A.M.E. Zion denomination are codified, and published, in its *Book of Discipline of the African Methodist Episcopalian Zion Church.* The *"Book of Discipline"* is published quadrennially. Because they were applicable either when property was purchased or while it was being held prior to From the Heart's disaffiliation, several editions of the *Book of Discipline,* specifically those dating from 1980 through 1996, are relevant to the resolution of the case *sub judice.* Given that the applicable provisions of each of those editions are identical and both parties rely only on the 1996 edition of the Book of Discipline, however, we likewise shall restrict our consideration to that edition.

The 1996 *Book of Discipline* addresses, as did the predecessor and successor editions, the requirement that places held or hereafter acquired by a local church, for the purpose of worship or parsonage, be held in trust for A.M.E. Zion denomination. Paragraph 494 provides:

> All written instruments of conveyance by which premises are held or hereafter acquired, for use as a place of Divine worship for members of the African Methodist Episcopal Zion Church or for other church activities, shall contain the following trust clause:

> In trust, that said premises shall be used, kept, maintained, and disposed of as a place of divine worship for the use of the ministry and membership of the African Methodist Episcopal Zion Church in America; subject to the discipline, usage and ministerial appointments of said church as from time to time authorized and declared by the General Conference of said church, and the Annual Conference in whose bounds the said premises are situated. This provision is solely for the benefit of the grantee,

and the grantor reserve[s] no right or interest in said premises.

The same requirement is imposed on the deeds for parsonage property by ¶ 495.1. It provides:

1. All written instruments by which premises are held or hereafter acquired as a parsonage for the use and occupancy of the ministers of the African Methodist Episcopal Zion Church shall contain [the same trust clause as set out in ¶ 494, creating a trust, solely for the benefit of the grantee, over such parsonage property].

Under ¶ 493, "[i]t is the duty of the *Pastor and Presiding Elder* to see that our Church Property is deeded according to our Book of Discipline, and duly incorporated in accordance with the laws of the State or the Territory in which it is situated." The *Book of Discipline* also provides for the eventuality that the trust clause is, for one reason or another, omitted from a deed. In ¶ 495.2, it states:

2. However, the absence of the trust clause stipulated in ¶ 494 and ¶ 495 in deeds and conveyances previously executed, shall in no way exclude a local church from, or relieve it of, its African Methodist Episcopal Zion Church Connectional responsibilities nor shall it absolve a local congregation or board of trustees of its responsibility to the African Methodist Episcopal Zion Church, provided that the intent and desire of the founders and/or the later congregations and board of Trustees is shown by any or all of the following indications: (a) The conveyance of the property to the trustees of the local African Methodist Episcopal Zion Church or any of its predecessors; (b) The use of the name, customs, and policy of the African Methodist Episcopal Zion Church in such a way as to be thus known to the community as a part of this denomination; (c) The acceptance of the pastorate or ministers appointed by a bishop of the African Methodist Episcopal Zion Church, or employed by the Presiding Elder of the district in which it is located.

In addition, the *Book of Discipline* contains provisions that do not directly require conveyance of church property

in trust, but nevertheless have been argued to be relevant to the determination of the ownership of church property upon withdrawal of a local church from the A.M.E. Zion church. Under ¶ 495.3, it is required that property be sold "in conformity with the Discipline." Paragraph 498.1 is to similar effect, providing:

1. The Trustees shall not in any case whatsoever dispose of Church Property by sale or otherwise without the consent of the majority of the Members in Full Connection, expressed by vote in a meeting called for that purpose, of which due notice has been given. Provided, however, that no congregation, pastor, nor Trustee Board or agent of the congregation shall mortgage or sell *any* property of the A.M.E. Zion Church without confirmation of the Quarterly Conference and written consent of the Bishop of the District or the Annual Conference.

Finally, ¶ 498.2, applicable to the situation where there is no pastor because there is no local congregation, provides:

1. It is further provided that where there is a Church or circuit, or a Station, without a Pastor, because the membership has withdrawn and scattered and there is no Congregation, and no need for an appointment of a Preacher to this place, that the Conference in which the Church is located may pass a resolution declaring the Church or Circuit, or Station discontinued or abandoned and ordering the sale of the property, and approved by the Bishop; the Bishop of the District shall give a deed to the purchaser for the same, and the proceeds from the sale of said property turned over to the Annual Conference for its disposition.

## C.

Upon being notified by From The Heart that it intended to withdraw from the A.M.E. Zion denomination, [A.M.E. Zion] requested From The Heart to turn over, and transfer ownership of, the real and personal church property it had amassed, to it. From The Heart declined to do so and,

instead, filed, in [circuit court], an action, seeking, among other things, a declaratory judgment that it was the sole and rightful owner of the real and personal property it had acquired, to quiet title to that real and personal property and preliminary injunctive relief. A.M.E. Zion answered and filed a counterclaim, in which, among other relief, it sought its own declaratory judgment with respect to property ownership. Moving to intervene, appellees Philadelphia–Baltimore Annual Conference and the newly incorporated [Full Gospel II], filed a separate action against the appellants, also seeking, among other relief, declaratory judgment with respect to property ownership, which it moved to consolidate with the pending actions. A.M.E. Zion later filed a motion to dismiss the declaratory judgment and quiet title counts of From the Heart's complaint and the appellants moved to dismiss both A.M.E. Zion's counterclaim and the separate action.

*From the Heart*, 370 Md. 152, 158–68, 803 A.2d 548 (footnotes omitted).

The circuit court granted a motion for summary judgment in favor of A.M.E. Zion, finding no genuine dispute as to any material fact and stated:

[D]uring its affiliation with the A.M.E. Zion Church, (From the Heart) accepted the pastors appointed by the bishops of the A.M.E. Zion Church ... used the name, customs and polity of the A.M.E. Zion Church in such a way as to be known in the community as a part of the A.M.E. Zion denomination ... [and,] at all material times, [the Discipline] included provisions requiring all local church property to be held in trust for the A.M.E. Zion Church.

*Id.* at 168–69, 803 A.2d 548. In so finding, the court declared that all property acquired by From the Heart prior to July 8, 1999, is subject to a trust in favor of A.M.E. Zion "as expressed in *The Book of Discipline of [A.M.E. Zion]*, which trust has the legal effect of requiring the property to stay within the A.M.E. Zion denomination and preventing From

the Heart . . . from retaining the property upon its decision to end its affiliation with [A.M.E. Zion]." *Id.* at 169, 803 A.2d 548.

While From the Heart's appeal to this Court was pending, the Court of Appeals issued a writ of certiorari on its own motion. On July 24, 2002, the Court reversed and remanded.

## B.

### *The Court of Appeals Decision*

■ The issue before the Court of Appeals was the owner-ship of the property acquired by From the Heart during its affiliation with A.M.E. Zion. *Id.* at 179, 803 A.2d 548. More specifically, the Court explained that, in reviewing the grant-ing of a motion for summary judgment, the issue was whether there was evidence in the record "of which there is no genuine dispute . . . that the church property was impressed with a trust, express or implied, in favor of A.M.E. Zion, as and when From the Heart acquired it." [6] *Id.* at 179, 803 A.2d 548 (citation omitted).

The Court focused on its prior decision in *Mt. Olive African Methodist Episcopal Church of Fruitland, Inc. v. Board of Incorporators of African Methodist Episcopal Church Inc.,* 348 Md. 299, 703 A.2d 194 (1997) ("*Mt. Olive*"). 370 Md. at 174, 803 A.2d 548. In *Mt. Olive,* the pastor, trustees, officers, and a majority of the congregation of a local church ended its more than a century-long affiliation with its denomination, which had a hierarchical form of church government. 348 Md. at 301–02, 703 A.2d 194. The *Mt. Olive* Court held that, upon withdrawal, the trustees and local congregation did not lose the rights given them by the deed of the property and confirmed by the Religious Corporation Law and the corpo-rate charter, to own, use and control that property. *From the*

---

**6.** A trust is "a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it." Restatement (Second) of Trusts, § 2. "The person who creates a trust is the settlor." *Id.* § 3.

*Heart*, 370 Md. at 174, 803 A.2d 548 (discussing *Mt. Olive*, 348 Md. at 320, 703 A.2d 194). To this end, the Court in *Mt. Olive* set out "the appropriate analytical framework." *From the Heart*, 370 Md. at 174, 803 A.2d 548. Under this framework:

"[I]t is clear that the resolution of church property disputes demand an analysis that involves the review of all relevant documents and circumstances. Unless the deed to the property clearly provides for the holding of the property in trust for the parent church, it is not enough to consider simply the form of the church government, the constitution or other authoritative sources pertinent to the parent church's claim to the property, consideration must also be given to the Religious Corporations Law, the relations between the parties, and the local church charter. The latter at the very least provides insight into the relations between the parties and may evidence the local church's consent to the form of government and to be bound by provisions in the parent church's constitution or other authoritative sources pertaining to the ownership and control of its property."

*Id.* (quoting *Mt. Olive*, 348 Md. at 320, 703 A.2d 194). The Court also noted *Mt. Olive's* rejection of the denomination's sole reliance on church doctrine, namely the Discipline, to the exclusion of evidence derived from an inspection of all relevant documents other than the Discipline. *From the Heart*, 370 Md. at 178, 803 A.2d 548.

Under the principles set forth in *Mt. Olive*, the Court in *From the Heart* opined:

[A] court faced with a church property dispute must review all relevant documents and circumstances, to include the denomination's polity, its constitution and other authoritative sources, the Religious Corporations law, the relations between the parties, the local church's charter and other pertinent documents to determine the proper resolution.... [U]nless the deed to the property contains a trust provision

in favor of the denomination, review solely of the doctrine and polity of the denomination simply is not sufficient. *Id.* at 185–86, 803 A.2d 548 (citation omitted).

The Court in *From the Heart* concluded that the circuit court should not have granted summary judgment, because the lower court determined that, based on the church's polity alone, From the Heart consented to be bound by the A.M.E. Zion Discipline. *Id.* at 186, 803 A.2d 548. In so doing, the trial court "fail[ed] to consider all of the relevant documents and circumstances," and relied exclusively on religious precepts in entering judgment on the denomination's behalf. *Id.* at 187, 803 A.2d 548.[7]

The Court of Appeals, as it did in *Mt. Olive,* rejected A.M.E. Zion's argument that, because the trust language applies even to those situations in which From the Heart failed to deed the local church property in trust for the denomination, the trial court need only consider the Discipline to resolve the property dispute. *Id.* at 188–89, 803 A.2d 548. The Court retorted that, where there is no clear trust/reverter language in the deed or any statutory authority, then the circuit court must expand its consideration to other documents and circumstances "to determine whether the local church has consented to the provision in the Discipline providing for the reversion of that property." *Id.* at 189, 803 A.2d 548.

In its final paragraph, the Court stated that "in Maryland, unless otherwise specifically provided, a trust is revocable." *Id.* at 189, 803 A.2d 548 (citing *Hoffa v. Hough,* 181 Md. 472, 30 A.2d 761 (1943)). Further, the Court noted that "as the circumstances and situations change, a trust may be revoked." *From the Heart,* 370 Md. at 189, 803 A.2d 548. Although the trust provisions in paragraphs 494 and 495 of the Discipline may apply "when the local church is affiliated with the denomination," the Court pointed out that neither paragraph indi-

---

7. The Court further noted that the trial court's entanglement in questions of religious polity failed to adhere to the neutral principles of law approach to church property disputes, likely implicating the First Amendment. *Id.* at 188, 803 A.2d 548.

cates that the trust provision is irrevocable nor what happens when the local church terminates its affiliation. *Id.* at 189, 803 A.2d 548. Further, the Court opined:

> Consent to holding property in trust during the course of affiliation does not automatically constitute consent to relinquishing that property once the affiliation terminates. This is particularly the case where the trust is revocable and is, therefore, another reason that there must be a more expanded review of documents and circumstances, as required by *Mt. Olive,* rather than merely the review of the church Discipline.

*Id.* at 189–90, 803 A.2d 548. On that final note, the Court reversed the trial court's judgment and remanded for further proceedings. *Id.* at 190, 803 A.2d 548.

## C.

### The Circuit Court Decision on Remand

On remand to the circuit court, the parties filed cross-motions for summary judgment. On August 17, 2006, the circuit court issued an oral opinion granting A.M.E. Zion's motion for summary judgment with respect to the real property and From the Heart's motion for summary judgment with respect to the personal property.

In its opinion, the circuit court stated the issue before it was "whether the trust clause[s] . . . created in the . . . [D]iscipline are revocable or irrevocable." The court went on to describe the two applicable trust clauses in the Discipline, Paragraph 494, which applies to church properties, used, maintained, or disposed of as a place of divine worship, and Paragraph 495, which applies to parsonages. The court found that "the language used in the [D]iscipline [ ] trust clause[s] does not provide for the power of revocation." "[W]here no power of revocation has been reserved," the court opined that "it has long been held [in Maryland] that . . . the trust is irrevocable." The court described cases in which "the court has considered the effect of the settler not reserving the power of revocation," and concluded that,

where the power to revoke has not been reserved, a trust can be set aside only on any ground on which a conveyance not in trust can be set aside. Example, fraud, duress, undue influence, breach of duty, and the confidential relationship, or mistake, *Liberty Trust [Co.]*v[ ]. *Weber*[200 Md. 491, 90 A.2d 194 (1952)] and hold—*Hoffa* v[ ]. [*Hough*], holding that where the power to revoke is reserved[, a] settler may revoke in any manner sufficient to indicate her intention.

The court went on to address From the Heart's argument that the Court of Appeals in *From the Heart* held that, when a trust is silent as to the power of revocation, it is revocable, citing *Hoffa v. Hough,* 181 Md. 472, 30 A.2d 761 (1943). The court explained that "it is clear that [*Hoffa* ] do[es] not hold that a trust is presumed revocable where no power to revoke is reserved:"

In *Hoffa,* the court was presented with the question of whether a trust had been revoked by the settler. There, the administrator of a mortgaged estate was attempting to assert the estate's interest in the property more than 12 years after the mortgagee[']s death. The court, in *Hoffa,* held that where the power of revocation has been reserved it may be exercised in any manner that sufficiently manifests the settler's intention to revoke the trust.

Furthermore, a large part of the court's holding in *Hoffa* hinged on the administrator's being barred by the doctrine of latches from asserting any interest in the property. The court, in *Hoffa,* plain[ly] did not address the situation where the power of revocation had not been reserved. A close reading of [*From the Heart* ] reveals that it is likely that in that court's first instance of citing *Hoffa* the Court of Appeals intended to cite it for the proposition that where the power of revocation is reserved it may be exercised in any fashion.

The circuit court did not apply a presumption of revocability claimed by From the Heart to be set forth by the Court of Appeals in *From the Heart.* The court refused to interpret

the language of the Court of Appeals as changing well-settled Maryland law, because "surely [the Court] would have given the proposition more than 50 words out of the 15 pages it used to discuss the issue."

The court concluded that "[i]t is abundantly clear from this Court's review of the trust clauses created by the applicable sections of the ... [D]iscipline[ ] that ... irrevocable trust[s] are created in the applicable church property." In doing so, the court rejected From the Heart's argument that the denomination could not retain any interest in the property after From the Heart withdrew from A.M.E. Zion unless the trust language specifically contained a reservation or a reverter provision. The court explained that the lack of a reverter provision in favor of A.M.E. Zion in the language of the trust or in the deed to the property "is not solely determinative of whether or not a beneficiary retains an interest in the trust property." Instead, the court pointed out that *Mt. Olive* and *From the Heart* instructed the court to "look at the governing documents of a denomination and the local church to determine whether or not the local church agreed to be bound by the provisions of the [D]iscipline, *i.e.*, consented to be bound and to hold its property in trust for the denomination."

"Consistent with the mandates of [the Court of Appeals in *From the Heart* ]," the court reviewed the Discipline, Religious Corporation Law, From the Heart's articles of incorporation, bylaws, correspondence, the deposition testimony of relevant parties, transcripts of church meetings, a sampling of the deed submitted for review, and various other documents submitted as exhibits with the motions for summary judgment.

Finding no dispute as to a material fact, the circuit court enumerated the following undisputed facts:

(1) [T]he history of the incorporation of Full Gospel [I], its growth, and transition into From the Heart ...

(2) [T]he role of Reverend Doctor Cherry ... in the growth of the Full Gospel [I] and the growth and development of From the Heart's Church Ministry

(3) [T]he volume of real property acquired by the local church

(4) [T]he vast financial assets acquired by the local church

(5) [T]he participation of the local church and the inter-working[s] of the denomination

(6) [T]he relationship of the pastor with the bishops in the conference

(7) [T]he fact that none of the property acquired by the local church was titled in trust for the denomination

(8) [T]he fact that the bishop and others in the denomination were aware that the property of a local church was not titled consistent with the requirement of the [D]iscipline[ ]

(9) [T]he fact that the local church, its board members, [and] pastors were aware that the property was not titled consistent with the [D]iscipline

(10) [T]he fact that Pastor Cherry accepted his pastoral appointment every year

(11) [T]he procedure of the [D]iscipline of the church w[as] followed by the local church for seemingly all aspects of church life, except for the manner in which property was titled

(12) [T]he local church sought permission from the bishop before disposing of church property consistent with the [D]iscipline

(13) [T]he local church continued to maintain that they would be bound by the [D]iscipline of [A.M.E. Zion]

(14) [T]hat the trust provisions of the [D]iscipline only address ... specific ... church property used or held at [a] ... place of d[i]vine worship or parsonages

(15) [T]hat church property is only referred to throughout the [D]iscipline in terms of real property

(16) [T]hat there's no trust language that specifically addresses personal property

(17) [T]hat all real property in question that is subject of this litigation was purchased by Full Gospel [I] prior to their withdrawal from the denomination in 1998

The court concluded that, "[a]fter considering all the factors and reviewing all the documents[,] ... there is ... no material

fact in dispute, and as a matter of law, the moving party is entitled to judgment." As to the real property, the court decided by clear and convincing evidence that an irrevocable trust was created in the real property acquired by Full Gospel I before it became From the Heart. The court reasoned:

> [T]he local church held itself out as A[.]M[.]E[.] Zion Church, [its] pastor accepted an appointment each year, and the local church governing documents notwithstanding changes that may have been made over the years continue to bind itself to the [D]iscipline[ ] of [A.M.E. Zion]. Therefore, the denomination is entitled to judgment as a matter of law as to the real property acquired by the local church from the time period specified in this opinion.

As to the personal property, the court found clear and convincing evidence that no trust was created in the personal property held by Full Gospel I before it became From the Heart. The court reasoned:

> [T]he [D]iscipline[ ] of the denomination does not create a trust in personal property that one could find by clear and convincing evidence here. Furthermore, neither the language of the [D]iscipline, nor the conduct of the property by the local church would indicate an indication of belief or intent to create an interest in said property by the denomination upon withdrawal [or] otherwise. Therefore, the local church is entitled to summary judgment as to all personal property acquired . . . .

On December 6, 2006, the court entered a final judgment pursuant to Maryland Rule 2–602(b) as to certain claims and stayed all remaining claims. From the Heart timely noted an appeal to this Court, and A.M.E. Zion filed a cross-appeal.

We set forth additional facts and proceedings below as necessary to discuss the issues presented.

### D.

#### *Standard of Review*

Review of a grant of summary judgment under Maryland Rule 2–501 requires an "examin[ation of] the same information

from the record and [a] determin[ation of] the same issue of law as the trial court." *Miller v. Bay City Prop. Owners Ass'n, Inc.,* 393 Md. 620, 632, 903 A.2d 938 (2006) (internal quotations omitted). On appeal, "[t]he question of whether a trial court's grant of summary judgment was proper is a question of law subject to *de novo* review...." *Myers v. Kayhoe,* 391 Md. 188, 203, 892 A.2d 520 (2006). Accordingly, "we independently review the record to determine whether the parties properly generated a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." *Id.*

Furthermore, it is well settled that " '[o]rdinarily a motion for summary judgment may be upheld only on the grounds relied upon by the hearing court.' " *Mt. Olive,* 348 Md. at 322, 703 A.2d 194 (quoting *Gross v. Sussex, Inc.,* 332 Md. 247, 276, 630 A.2d 1156 (1993)) (alteration in original). In other words, we " 'will not ordinarily undertake to sustain the judgment by ruling on another ground, not ruled upon by the trial court, if the alternative ground is one as to which the trial court had a discretion to deny summary judgment.' " *Mt. Olive,* 348 Md. at 322, 703 A.2d 194 (quoting *Three Garden Village Ltd. Partnership v. U.S. Fid. & Guaranty Co.,* 318 Md. 98, 108, 567 A.2d 85 (1989)). "Consequently, unless we conclude that the trial court was legally correct in granting summary judgment in favor of the petitioner, this case will have to be remanded for further proceedings." *Mt. Olive,* 348 Md. at 323, 703 A.2d 194 (citations omitted).

## DISCUSSION

### I.

### Real Property

### A.

### *Consent*

We first decide whether, on remand, the circuit court was correct in concluding that, with regard to the real property

acquired by it before withdrawal, From the Heart consented to the trust provisions in the Discipline in favor of A.M.E. Zion. To this end, we review not only the denomination's polity but all relevant documents and circumstances including From the Heart's charter and bylaws, the Religious Corporations Law, the relations and correspondence between the parties, the deposition testimony of the parties, and all relevant documents in the record.

 We begin by looking at From the Heart's original charter and governing documents. A local church's charter "must be considered when there is a question raised as to the adequacy of the proof that the parent church has acted, consistent with its form of church government, to maintain ownership or control over local church property." *Mt. Olive*, 348 Md. at 326 n. 14, 703 A.2d 194. In other words, "[t]he office of the charter . . ., ordinarily, is to provide evidence of the local church's consent to be bound by the parent church's polity." *Id.*

Following incorporation on May 2, 1983, the trustees of From the Heart signed a charter naming the local church "Full Gospel A.M.E. Zion Church, Inc." and adopted as its "plan and purpose," in pertinent part:

1. To conduct a church for christian religious purposes and to perform all necessary and allowable activities in connection therewith or incidental thereto, and to engage in any other lawful activity *in accordance with the Disciplines of the African Methodist Episcopal Zion Church.*

2. To do anything permitted by Subtitle 3 of Title 5 of the Corporations and Associations Article of the Annotated Code of Maryland, as amended from time to time.

(Emphasis added). In addition, the charter's "plan and purpose" provided that "the particulars of election and the duties of the trustees shall be as given in the Discipline[ ] . . . which are incorporated in the Plan of the Church by reference."

On December 20, 1991, From the Heart amended its 1983 charter to read:

The Corporation shall be operated exclusively for religious, charitable, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended. The purpose for which the corporation is formed is to conduct a church for Christian religious activities.

On the same day, From the Heart adopted "the official By–Laws" of the "Full Gospel A[.]M[.]E[.] Zion Church, Inc." ("the 1991 Bylaws"). The 1991 Bylaws were signed and attested to by the Secretary as being "the act and deed of the Corporation."

Although the amended charter deleted all reference to A.M.E. Zion, the 1991 Bylaws contained express provisions reaffirming From the Heart's affiliation with A.M.E. Zion and its adherence to the Discipline. Article III, Section 301 of the 1991 Bylaws stated: "The Church shall be a member of the African Methodist Episcopal Zion Church, and under the jurisdiction of the Washington District of the Philadelphia–Baltimore Conference." Article IV, Section 401 read: "The By–Laws of the Church shall be in accord with the Discipline of the African Methodist Episcopal Zion Church (hereinafter referred to as the "Discipline")." Article VII, Section 708(b) expressly incorporated both trust clauses set forth in Paragraphs 494 and 495 of the Discipline, providing:

It is the responsibility of the Board of Trustees to:

\* \* \*

(b) Include the necessary trust clause in deeds to real property acquired by the Church, as provided in Sections 431 and 432 of the Discipline [8] (notwithstanding the absence of such a clause in deeds previously executed does not exclude or relieve a Church of its African Methodist Episcopal Church Connectional Responsibilities).[9]

---

8. Sections 431 and 432 apparently were the predecessor to Paragraphs 494 and 495 of the Discipline. This fact was stated in A.M.E. Zion's brief and not disputed by From the Heart.

9. We note that From the Heart's adherence to the Discipline is also evidenced by Article VII, Section 708(c) of the 1991 Bylaws, which stated:

In his deposition testimony, Pastor Cherry testified that he knew that, with the adoption of the 1991 Bylaws, From the Heart was placing itself under the jurisdiction of A.M.E. Zion.

The 1991 Bylaws, however, included its own trust language. Article VII, Section 707 stated, in pertinent part:

\* \* \*

SECTION 707. DUTIES OF THE BOARD OF TRUS-TEES: The Board of Trustees shall be responsible to the Quarterly Conference of the Charge, and shall be required to present a full report of its acts at every Quarterly Conference.

\* \* \*

■ (b) It is the duty of the Board of Trustees to take charge of and protect the Church property with all its appurtenances **in trust for the Membership,** and to make improvements as may be necessary from time to time for the interest of the Church.

(Emphasis added). From the Heart argues that Section 707(b) of the 1991 Bylaws "adopts the Maryland presumption that local churches hold their property in trust for their own members." We disagree.

The language of Section 707 that preceded and encompassed all the subsections of Section 707, including subsection (b),

---

It is the responsibility of the Board of Trustees to:

\* \* \*

(c) Dispose of Church property by sale or otherwise only with the consent of the majority of the Members in Full Connection expressed by vote in a meeting called for that purpose, of which due notice has been given; provided, however, that no Congregation, Pastor or Board of Trustees, or agent of the congregation shall mortgage or sell any property of the Church without the written consent of the Bishop of the District or the Annual Conference, as set forth in Section 435 of the Discipline.

In addition, Article VIII, Section 803 stated:

The executive officers of the Church shall be subject to the oversight of and shall give account to the Presiding Elder of the Washington District and the Presiding Bishop of the Philadelphia–Baltimore Conference of the African Methodist Episcopal Zion Church.

required the Board of Trustees to be "responsible to the Quarterly Conference of the Charge," which is an organizational body of A.M.E. Zion. In order to become a full member of From the Heart, Section 602 of the 1991 Bylaws required that the prospective member be satisfactorily examined "by the Pastor before the Church as required in Section 582 of the Discipline." The Discipline set forth the questions and answers to be used in the examination of a prospective member of a local church and required an affirmative response to the following: "Will you cheerfully be *governed by the Rules of the African Methodist Episcopal Zion Church,* hold sacred the Ordinances of God, and endeavor, as much as in you lies, to promote the welfare of the Redeemer's kingdom?" (Emphasis added). Consequently, even if the term "Membership" referred to the members of From the Heart, the 1991 Bylaws subjected the Board of Trustees and the members to governance by A.M.E. Zion according to the Discipline.

Moreover, Section 708(b) of the 1991 Bylaws expressly provided that the Board of Trustees include the Discipline's trust clause in deeds to real property acquired by From the Heart and that the absence of such clause did not relieve From the Heart of its responsibility to A.M.E. Zion under that clause. Therefore, Section 707(b) of the 1991 Bylaws does not provide clear and convincing support for the proposition that From the Heart held its real property in trust for its members, rather than for A.M.E. Zion. *See Babcock Mem'l Presbyterian Church v. Presbytery of Baltimore of the United Presbyterian Church,* 296 Md. 573, 588, 464 A.2d 1008 (1983), *cert. denied,* 465 U.S. 1027, 104 S.Ct. 1287, 79 L.Ed.2d 689 (1984) ("[A] religious corporation thus formed may ... by contract—express or implied—adopt a presbyterial or episcopal polity and, if this is done, may provide for the holding of the local church property subject to the provisions of the constitution, charter or by-laws of a denomination....").

We agree with A.M.E. Zion that the trial judge "correctly ruled that 'the local church governing documents[,] notwithstanding changes that may have been made over the years[,]

continue[d] to bind itself to the [D]iscipline[ ] of the A[.]M[.]E[.] Zion Church.' "

We next examine the relations and correspondence between the parties for any additional evidence of consent. In our review of the record, we find numerous documents evidencing From the Heart's use of "A.M.E. Zion" as a part of its name in printed and published materials, in connection with its works, and on the deeds of real property it acquired.

A.M.E. Zion had a presence not only in From the Heart's name but also in its services For instance, in a church dedication service taking place on September 18, 1983, Bishop Charles H. Foggie of A.M.E. Zion's 3rd Episcopal District gave the communion sermon as well as a dedication/consecration service. During the dedication ritual, Bishop Foggie declared that the church was to follow "the Discipline and Usages of the [A.M.E.] Zion Church." Also, as previously stated, every new member of From the Heart pledged his or her willingness to be governed by the Rules of A.M.E. Zion.

The properties deeded to From the Heart were paid for by From the Heart's own funds, consisting of tithes and offerings of its members and friends. No financial contribution was provided by A.M.E. Zion. From the Heart, however, consistently contributed to A.M.E. Zion financially by providing substantial amounts of money to build A.M.E. Zion schools or churches in the United States and abroad and by giving hundreds of thousands of dollars to the General Conference.

Also among the relevant documents, we note Pastor Cherry's annual appointments by the Philadelphia and Baltimore Conference of A.M.E. Zion as the pastor in charge of From the Heart. These pastoral appointments by A.M.E. Zion authorized Pastor Cherry "to perform all the Pastoral functions set forth in the Discipline." In fact, Pastor Cherry accepted his eighteenth annual pastoral appointment to From the Heart on May 22, 1999.

From the Heart kept A.M.E. Zion apprized of its status by sending reports of achievement to be included in written annual reports of the Philadelphia and Baltimore Conference

of A.M.E. Zion. Pastor Cherry presented A.M.E. Zion with a Pastor's Report, documenting various aspects of the congregation including its number of churches, number of parsonages, insurance coverage, number of members, and a financial snapshot of the congregation. The record contains a Pastor's Report filled out by Pastor Cherry as late as April 14, 1999 for the 1998–99 Conference year. Pastor Cherry attached to his Pastor's Report a document entitled "Church Mission Statement," which stated:

> [From the Heart], founded by [Pastor Cherry], was established to raise the spiritual level of Prince George's County through the establishment of an A[.]M[.]E[.] Zion Church. [From the Heart's] purpose is to have a strong spiritual impact on the community, the Philadelphia–Baltimore Conference, and ultimately [A.M.E. Zion]. The objective of the Church is to be a model of excellence through strict adherence to Methodism **as defined in the Discipline of [A.M.E. Zion].** Administrative excellence and spiritual holiness are the fundamental principles of the A[.]M[.]E[.] Zion Discipline that [From the Heart] is built upon. The goal of the Church is to be a congregation of people who love God, hate sin, and love to give.

(Emphasis added).

Pastor Cherry also attached to his Pastor's Report a Progress Evaluation Form through which Pastor Cherry self-assessed his development as a pastor. In that form, Pastor Cherry gave himself a 10 on a scale of 1 to 10 in response to the following statements: "I could easily recite The Mission Statement to my Team;" "I constantly present the Mission Statement [to] my Team;" "In my heart I support the objectives of our Mission Statement;" "I actively pursue the objectives of our Mission Statement;" "I demonstrate compatibility with my organisation's [sic] philosophy;" and "I am happy to work within the structure of my organisation [sic]."

Correspondence between Steven E. Murray, Special Advisor to Pastor Cherry, and Bishop Milton A. Williams, Sr., the Presiding Prelate of the A.M.E. Zion Mid–Atlantic II Episco-

pal District, documents From the Heart's practice of seeking permission from A.M.E. Zion before selling church property in accordance with the Discipline. Specifically, one letter to Bishop Williams dated November 2, 1993, stated:

> Under the guidelines of the Discipline of the A[.]M[.]E[.] Zion Church we must seek your approval, and the approval of the quarterly conference before a property could be sold by [From the Heart]. To this end Dr. John A. Cherry, our pastor, has sought your oversight and direction in regards to procedures we should take.

Various other documents before the circuit court on remand also show From the Heart's consent to be subject to the Discipline. The minutes of a From the Heart Members Meeting on May 14, 1998, which informed the members of a restructuring of Full Gospel I into From the Heart, noted that the church was "defined by the Discipline." In addition, in its 1991 Application for Tax Exemption, From the Heart answered affirmatively that it "control[s] or . . . is . . . controlled by [another] organization." Explaining its answer, From the Heart noted that "[t]he General Conference [of A.M.E. Zion] sets the basic tenants of the 'Discipline', which is the instrument that sets forth the laws, plan, policy and process by which member A.M.E. Zion Churches govern themselves." From the Heart stated that it was "[financially] accountable to the African Methodist Episcopal Zion Church's General Conference." When the application asked about its religious hierarchy, From the Heart referred to the description of the hierarchy provided in the Discipline.

The deposition testimony in the record provides additional evidence of consent. We highlight the most pertinent portions of deposition testimony.

In his deposition, Pastor Cherry agreed that he was expected to establish an A.M.E. Zion Church at Marlow Heights, Maryland, a church that he understood would be under the governing authority of the A.M.E. Zion Discipline. Although he admitted that he had not read and familiarized himself with the Discipline in its entirety, Pastor Cherry testified that he

had studied the Discipline in order to carry out all of his duties as a pastor in the church. He further testified that he committed himself to the Discipline during the period that he served as an A.M.E. Zion pastor. He acknowledged that, as a pastor of the A.M.E. Zion Church, he associated himself with the denomination "[w]holeheartedly" and was well aware that he submitted himself to the authority and structure of the A.M.E. Zion Church. Pastor Cherry acknowledged that he and the trustees recognized that they were operating under the Discipline, which set forth the rules, regulations, and guidelines governing the church. He agreed that From the Heart used "A.M.E. Zion" in its name, followed the customs and polity of the denomination, and accepted the pastorate of ministers appointed by the bishop of A.M.E. Zion.

In addition to being Pastor Cherry's special advisor, Murray was former chief legal counsel and trustee of From the Heart. In his testimony Murray acknowledged that it was a connectional responsibility for the local church to abide by the Discipline and its hierarchical structure. He agreed that the trustees of From the Heart had to follow the tradition and regulations of the Discipline as it applied to local churches. He further testified that From the Heart's affiliation with A.M.E. Zion did benefit the church and contribute to its growth, but credits Pastor Cherry's leadership, charisma, and vision as the primary reason for the church's growth.

Based on our review of the record, we agree with the circuit court on remand that "the procedure of the [D]iscipline of the church w[as] followed by [From the Heart] for seemingly all aspects of church life, except for the manner in which property was titled." We thus conclude that the circuit court did not err in finding no genuine dispute as to the fact that From the Heart consented to "be bound by the [D]iscipline of ... A[.]M[.]E[.] Zion."

## B.

### Control of the Real Property Upon Withdrawal

We next address whether the trust language in the Discipline indicated an intention on the part of A.M.E. Zion to

control the real property of From the Heart upon withdrawal from A.M.E. Zion. The relevant language, found in Paragraph 494 of the Discipline applies to places of worship [10] and provides:

All written instruments of conveyance by which premises are held or hereafter acquired, for use as a place of Divine worship for members of the African Methodist Episcopal Zion Church or for other church activities, shall contain the following trust clause:

"In trust that said premises shall be used, kept[,] maintained, and disposed of as a place of Divine Worship for the use of the Ministry and Membership of the African Methodist Episcopal Zion Church in America, subject to the Discipline, Usage and Ministerial appointments of said Church, as from time to time authorized and declared by the General Conference of said Church, and by the Annual Conference within whose bounds the said premises are situated. This provision is solely for the benefit of the grantee, and the grantor reserve[s] no right or interest in said premises."

From the Heart argues that the trust language was not sufficient to show control after disaffiliation. Instead, From the Heart contends that the trust clauses lacked reverter language necessary for A.M.E. Zion to retain control over the property following withdrawal. In so arguing, From the Heart cites *From the Heart,* particularly the Court's mention that the trust clauses do not "address[ ] the situation in which, as occurred here, the local church terminates the affiliation." 370 Md. at 189, 803 A.2d 548. From the Heart further relies on the Court's remark that "[t]here is no express provision dealing with the disposition of church property when a local church disaffiliates from the denomination and certainly there is not an express provision mandating that such church relinquish its property upon that occurrence." *Id.* Therefore, From the Heart concludes that the trust clauses "appl[y] only while a church is affiliated with the Denomination, ... it does

---

**10.** As noted, *supra,* Paragraph 495.1 of the Discipline imposes the same trust requirements on parsonages.

not require reversion at withdrawal, and that consenting to the [trust clauses] does not consent to reversion."

*Jones v. Wolf,* 443 U.S. 595, 597, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), involved a church property dispute arising from a schism in a local church affiliated with a hierarchical church organization. The Supreme Court in Jones noted the means by which parties to a church property dispute could ensure control over property in the event of a schism. *Id.* at 606. The Court opined:

> Under the neutral-principles approach, the outcome of a church property dispute is not foreordained. At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. **They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church.** The burden involved in taking such steps will be minimal. **And the civil courts will be bound to give effect to the result indicated by the parties,** provided it is embodied in some legally cognizable form.

*Id.* at 606 (emphasis added). In so stating, the Court referred to the use of trust language interchangeably with that of reverter language, suggesting that the presence of trust language alone is sufficient to indicate a church's intention to control church property in the event of disaffiliation. The Court of Appeals in *From the Heart* was equally clear when it equated trust and reverter language, declaring that "[o]nly when there is clear *trust/reverter language* in the deed to the property (Eldership option I), or a statute enacted by the Legislature (Eldership option III), is there no need to consider other documentation." 370 Md. at 189, 803 A.2d 548 (emphasis added).

▪ The plain language of the trust clause in the Discipline lends additional support to A.M.E. Zion's claim to control From the Heart's real property. Paragraph 494 provides that

real property acquired or held for use as a place of divine worship shall be "for the use of the Ministry, and Membership of the African Methodist Episcopal Zion Church in America" and shall be "subject to the Discipline, Usage and Ministerial appointments of said Church." Similarly, under Paragraph 495, real property acquired or held as a parsonage shall be "for the use and occupancy of the Ministry of the African Methodist Episcopal Zion Church in America, who may from time to time be stationed in such place, subject to the provisions of the Discipline and usage of said Church." Pellucidly, if From the Heart retains control over its real property used as a place of worship or parsonage upon disaffiliation from A.M.E. Zion, that property will no longer be used for the "ministry and membership" of A.M.E. Zion, or be "subject to the discipline, usage and ministerial appointments" of A.M.E. Zion, or occupied as a residence by ministers appointed by A.M.E. Zion "who may from time to time be stationed in such place." In other words, allowing From the Heart to retain its places of worship and parsonages upon disaffiliation from A.M.E. Zion would violate the express language of the trust clauses in the Discipline.[11]

It follows from our examination of the trust language in the Discipline that the lack of an express provision calling for the reversion of From the Heart's real property upon withdrawal does not preclude A.M.E. Zion's control over that property. Moreover, we disagree with From the Heart's argument that, in *From the Heart*, the Court of Appeals indicated a necessity for such reversion language in the trust clauses. The Court

---

**11.** We recognize that in *From the Heart* the Court of Appeals observed that "[t]here is no express provision dealing with the disposition of church property when a local church disaffiliates from the denomination." 370 Md. at 189, 803 A.2d 548. We agree that there is no such "express provision" in the trust language. Nevertheless, we believe that the trust language necessarily implies that A.M.E. Zion would retain control upon From the Heart's disaffiliation. Moreover, as explained *infra*, if the trust provisions in the Discipline did not provide for retention of control by A.M.E. Zion upon From the Heart's withdrawal, whether or not From the Heart consented to the trust provisions would be irrelevant.

held that the trial court erred by considering only the church polity to determine that From the Heart "consented to abide by the A.M.E. Zion Discipline." *From the Heart,* 370 Md. at 187, 803 A.2d 548. The Court cited to evidence that From the Heart "did not, in fact, consent to the *trust provisions.*" *Id.* at 186, 803 A.2d 548 (emphasis added). The Court stated that it was necessary for the trial court "to consider other documentation or circumstances to determine whether the local church has consented to the provision in the Discipline providing for the reversion of that property." *Id.* at 189, 803 A.2d 548. If the Court had determined that the trust language in A.M.E. Zion's Discipline was insufficient as a matter of law to provide for a reversion of From the Heart's real property upon disaffiliation, there would have been no need for the Court to direct the trial court, on remand, to examine all the documentation and circumstances to determine whether From the Heart consented to the trust provisions in the Discipline. *See id.* at 186–87, 803 A.2d 548.

Therefore, we conclude that the trust language in the Discipline indicates a clear intention on the part of A.M.E. Zion to control the places of worship and parsonages owned by its local churches both during affiliation and afterwards. Accordingly, the trust language in the Discipline, as consented to by From the Heart, is sufficient to establish A.M.E. Zion's control over From the Heart's real property used as places of worship or parsonages upon From the Heart's withdrawal from A.M.E. Zion.

## C.

### *Revocability*

Having determined that the trust provisions provide for A.M.E. Zion's control of the real property upon disaffiliation, we next determine whether the trust language was irrevocable. *See From the Heart,* 370 Md. at 189–90, 803 A.2d 548 ("Consent to holding property in trust during the course of affiliation does not automatically constitute consent to relinquishing that property once the affiliation terminates ....

*particularly [in] the case where the trust is revocable . . . ."* (Emphasis added)).

In Maryland, there is a presumption that trusts are irrevocable unless the power to revoke has been reserved. *See Liberty Trust Co. v. Weber,* 200 Md. 491, 506, (1952) ("The law of Maryland is accurately stated in Restatement, Trusts, § 330, '(1) The settlor has power to revoke the trust if and to the extent that by the terms of the trust he reserved such a power. (2) Except as stated in § § 332 and 333, the settlor cannot revoke the trust if by the terms of the trust he did not reserve a power of revocation.' "); *Dayton v. Stewart,* 99 Md. 643, 648, 59 A. 281 (1904) ("a trust once created and accepted, without reservation of power, can only be revoked by the full consent of all parties in interest; if any of the parties are not in being or are not *sui juris,* it cannot be revoked at all."); *Milholland v. Whalen,* 89 Md. 212, 215, 43 A. 43 (1899) ("[U]nless the declaration of trust contains a power of revocation, it leaves [the grantor of the trust] powerless to extinguish the trust.").

The Court of Appeals in *From the Heart* stated:

Once established, a trust may be modified without the beneficiaries' consent, but only if the power to do so is reserved. *Milholland,* 89 Md. at 215, 43 A. 43. . . . If no such right has been reserved, then the beneficiaries' consent is required before the trust may be modified. *See Allen v. Safe Deposit & Trust Co.,* 177 Md. 26, 29, 7 A.2d 180 . . . (1939). A trust may be designated as either revocable or irrevocable, *See Hoffa v. Hough,* 181 Md. 472, 475, 30 A.2d 761 . . . (1943); in the absence of a designation, the trust is revocable by any act sufficient to manifest the settlor's intention to revoke the trust. *Id.*

*From the Heart,* 370 Md. at 184, 803 A.2d 548.

From the Heart argues on appeal that "the Court made clear that trusts are presumed revocable" and that the circuit court "refused to abide by the Court of Appeals' ruling." We disagree. The Court clearly stated that "[o]nce established, a trust may be modified without the beneficiaries' consent, but

*only if* the power to do so is reserved." *Id.* (emphasis added). The Court certainly did not intend to change Maryland case law precedent, because the Court cited cases standing for the proposition that a trust is presumed irrevocable where the power to revoke has not been reserved.

■■■ Although the Court of Appeals, in the last paragraph of its opinion, stated that "in Maryland, unless otherwise specifically provided, a trust is revocable," we still do not agree with From the Heart. *Id.* at 189, 803 A.2d 548. In stating that proposition, the Court cited *Hoffa v. Hough*, 181 Md. 472, 30 A.2d 761 (1943), a case that does not alter the longstanding principle in Maryland that trusts are presumed irrevocable. *From the Heart*, 370 Md. at 189, 803 A.2d 548. In *Hoffa*, the trust was not presumed revocable; it was created as a revocable trust. 181 Md. at 473–74, 30 A.2d 761. The Court of Appeals stated in *Hoffa*: "The deed of trust was revocable. The settlor reserved the power to convey, release or otherwise dispose of the property." *Id.* The settlor in *Hoffa*, however, did not specify the precise manner of revocation. *Id.* at 475–76, 30 A.2d 761. The Court explained that, "where a settlor has reserved the power to revoke the trust, but has not specified any mode of revocation, the power can be exercised in any manner which sufficiently manifests the intention of the settlor to revoke the trust." *Id.* Thus the issue in *Hoffa* was whether the settlor sufficiently manifested an intention to revoke the trust, not whether the settlor had the power to revoke. *Id.* at 474–75, 30 A.2d 761. In addressing that issue, the Court discussed the different ways in which the power to revoke can be exercised when a settlor has reserved the power to revoke the trust but has not specified any mode of revocation. *Id.*

As we understand its opinion in *From the Heart*, the Court of Appeals, in applying the principles of trust law, instructed the circuit court on remand to examine (1) whether From the Heart consented to the trust provisions in the Discipline, and (2) whether the right to modify the trust had been reserved. As correctly pointed out by the trial court, there is no lan-

guage in the trust clauses in the Discipline that reserves the right to revoke or implies such a right. Thus From the Heart did not have the power to revoke the trust impressed on its real property by the trust language of the Discipline and consented to by From the Heart. Accordingly, we conclude that the circuit court was correct in holding that the trust created on From the Heart's real property was irrevocable.

## D.

### *Waiver & Estoppel*

#### i.

#### Waiver

From the Heart contends that A.M.E. Zion's claim to the real property is barred by the doctrines of waiver and equitable estoppel.

▇▇▇▇ Waiver is an intentional and voluntary relinquishment of a known right. *Myers v. Kayhoe,* 391 Md. 188, 205, 892 A.2d 520 (2006); *Creveling v. Gov't Employees Insur. Co.,* 376 Md. 72, 96, 828 A.2d 229 (2003). It " 'may result from an express agreement or be inferred from circumstances.' " *Gold Coast Mall, Inc. v. Larmar Corp.,* 298 Md. 96, 109, 468 A.2d 91 (1983) (quoting *BarGale Indus., Inc. v. Robert Realty Co.,* 275 Md. 638, 643, 343 A.2d 529 (1975)). "The intention to waive must be clearly established and will not be inferred from equivocal acts or language." *Gold Coast Mall,* 298 Md. at 109, 468 A.2d 91. The Court of Appeals recently reiterated this principle:

> Waiver rests upon the intention of the party, and therefore, acts relied upon as constituting waiver must unequivocally demonstrate that waiver is intended. The right or advantage waived must be known; "[t]he general rule is that there can be no waiver unless the person against whom the waiver is claimed had full knowledge of his rights, and of facts which will enable him to take effectual action for the enforcement of such rights."

*Taylor v. Mandel,* 402 Md. 109, 135–36, 935 A.2d 671 (2007) (citations omitted) (alteration in original).

 From the Heart asserts that A.M.E. Zion, through its bishops and elders, knew or should have known that From the Heart did not include in its deeds the appropriate trust clauses in favor of the denomination and took no action to correct the deeds. These facts, according to From the Heart, raise a reasonable inference that A.M.E. Zion intentionally relinquished its right to reversion of From the Heart's real property. We disagree.

As previously stated, the Discipline, to which From the Heart agreed to be bound, required the insertion of trust language in favor of A.M.E. Zion in deeds for property held or thereafter acquired by From the Heart for the purpose of worship or as a parsonage. In addition, Paragraph 495.2 of the Discipline provided that, in the event a trust clause was absent from a deed or conveyance, From the Heart was not relieved from its connectional responsibilities or absolved from its responsibilities to the A.M.E. Zion. Thus the lack of trust clauses in From the Heart's deeds did not affect, in any way, A.M.E. Zion's rights to From the Heart's real property provided by the trust clauses. Consequently, when A.M.E. Zion learned that From the Heart's deeds did not contain the trust clauses, A.M.E. Zion did not have to take any action to preserve its rights under those clauses. Accordingly, A.M.E. Zion's knowledge and failure to act cannot support a reasonable inference that A.M.E. Zion unequivocally intended to waive its rights to a trust in its favor as provided in the Discipline.

### ii.

### Estoppel

 "Equitable estoppel essentially consists of three elements: 'voluntary conduct or representation, reliance, and detriment.'" *Hill v. Cross Country Settlements, LLC,* 402 Md. 281, 310, 936 A.2d 343 (2007) (quoting *Mona Elec. Co. v. Shelton,* 377 Md. 320, 334, 833 A.2d 527 (2003)). "Ordinarily,

when a party has waived a right and then retracts his waiver, the effect of the retraction is to revive the right, subject to the doctrine of equitable estoppel." *Brockington v. Grimstead,* 176 Md.App. 327, 355–56, 933 A.2d 426 (2007), *cert. granted,* 403 Md. 304, 941 A.2d 1104 (2008). The doctrine of equitable estoppel " 'lies at the foundation of the law of waiver because estoppel arises as a result of the voluntary conduct of one party, whereby he is precluded from asserting a right as against another person who has, in good faith, relied upon such conduct and has been led thereby to change his position for the worse.' " *Id.* at 356, 933 A.2d 426 (quoting *Arnold Bernstein Shipping Co. v. Tidewater Commercial Co.,* 84 F.Supp. 948, 952 (D.Md.1949)). "In other words, a waiver cannot be revoked when the opposing party has relied upon it and would be prejudiced by the revocation or the revocation would result in an improper manipulation of the judicial process." *Brockington,* 176 Md.App. at 356, 933 A.2d 426.

Applying the three elements of equitable estoppel, From the Heart argues that (1) A.M.E. Zion failed to review, correct, or inform From the Heart that its deeds did not contain trust language providing for reversion of its real property to the denomination; (2) From the Heart reasonably relied on A.M.E. Zion's inaction; and (3) From the Heart's reliance was detrimental because of the "truly massive forfeiture of property" at stake.

■■■ In response, A.M.E. Zion asserts that From the Heart "cannot plausibly contend that A[.]M[.]E[.] Zion's alleged inaction led [From the Heart] to believe that it owned its real property free of any trust obligations to A[.]M[.]E[.] Zion." We agree.

Upon the question of equitable estoppel ... it [is] "essential for its application with respect to the title of real property that the party claiming to have been influenced by the conduct or declarations of another to his injury was himself not only destitute of knowledge of the true state of the title, but also of any convenient and available means of acquiring such knowledge. Where the condition of the title is known

to both parties, or both have the same means of ascertaining the truth, there can be no estoppel."

*Milburn v. Michel,* 137 Md. 415, 422–23, 112 A. 581 (1921) (quoting *Mountain Lake Park Ass'n v. Shartzer,* 83 Md. 10, 13, 34 A. 536 (1896)).

The Discipline clearly sets forth trust clauses in A.M.E. Zion's favor. The Discipline provides that the trust provisions apply even where From the Heart neglected to include the trust clauses in the deeds. From the Heart expressly incorporated the Discipline into its 1991 Bylaws as "the act and deed of the [church]." From the Heart also had as much knowledge of the true state of the title of the real property as A.M.E. Zion, and both parties had the " 'convenient and available means of acquiring such knowledge.' " " *Milburn,* 137 Md. at 423, 112 A. 581 (quoting *Mountain Lake Park Ass'n,* 83 Md. at 13, 34 A. 536)." Consequently, From the Heart knew that A.M.E. Zion's inaction regarding the lack of trust clauses in From the Heart's deeds would have no effect on A.M.E. Zion's rights under the trust language of the Discipline, thereby precluding any reasonable reliance on A.M.E. Zion's conduct. Therefore, as with the defense of waiver, we conclude that the trial court also did not err by rejecting the defense of equitable estoppel as a matter of law.

For the foregoing reasons, we hold that the circuit court was correct in granting summary judgment in favor of A.M.E. Zion with regard to the real property owned by From the Heart at the time of its withdrawal and subject to the trust language of the Discipline.

## II.

### Personal Property

On cross-appeal, A.M.E. Zion argues that the circuit court erred in granting summary judgment to From the Heart as to the personal property. Specifically, A.M.E. Zion argues that the circuit court "overlooked [its] argument that it was entitled to recover all of [From the Heart's] property (real and personal) on the grounds that [From the Heart] and Pastor

Cherry do not qualify as the legal successor of the corporate entity (*i.e.,* Full Gospel [I]) that held legal title to all of the assets at issue." In the alternative, A.M.E. Zion contends that the circuit court erred because "the record contained ample evidence of an implied trust in A[.]M[.]E[.] Zion's favor over local church personal property." Both of A.M.E. Zion's arguments are without merit.

## A.

### Lawful Corporate Successor to Full Gospel I

A.M.E. Zion contends that From the Heart has no claim to the personal property irrespective of the existence of a trust in A.M.E. Zion's favor. A.M.E. Zion asserts that any claim to the church property depends on whether From the Heart was the lawful corporate successor to Full Gospel I " 'because the title to the church follows the lawful congregation.' " (Quoting 66 Am.Jur.2d *Religious Societies* § 49). A.M.E. Zion argues that From the Heart was not the lawful corporate successor to Full Gospel I and thus has no right to any of the church property, real *or personal.* We disagree and explain.

The issue of corporate succession is not raised by the facts of the instant case. The 1998 amendments to From the Heart's articles of incorporation did not create a new corporation to succeed Full Gospel I. From the Heart was incorporated as Full Gospel I on May 2, 1983. *From the Heart,* 370 Md. at 158, 803 A.2d 548. In pertinent part, the 1998 amendments to the articles of incorporation merely changed the corporation's name from Full Gospel I to From the Heart. *Id.* at 162, 803 A.2d 548. The Court of Appeals in *From the Heart* implicitly recognized that From the Heart was not a successor corporation, noting that the 1998 amendments to From the Heart's articles of incorporation "adopted the church's present name, ... and provided, consistent with its By-laws, that the church would have all of the general powers of a Maryland corporation." *Id.* Pastor Cherry stated in his affidavit that From the Heart's adoption of the amendments to the articles of incorporation and bylaws in 1998 changed the formal corpo-

rate name of Full Gospel I to From the Heart. He further stated that the 1998 amendments did not change the owner-ship of From the Heart's properties, rather, only From the Heart's name changed. Thus, we conclude that From the Heart remains the same corporate entity as Full Gospel I,[12] albeit with a different name.[13]

*Babcock,* 296 Md. 573, 464 A.2d 1008, is also unavailing. *Babcock* involved a dispute that arose between Babcock Me-morial Presbyterian Church ("Babcock") and the higher judi-catories of The United States Presbyterian Church ("United"). *Id.* at 575, 464 A.2d 1008. Shortly before its withdrawal from United, Babcock gifted real property containing the church building to Merritt Boulevard Presbyterian Church of Dun-dalk, Inc. ("Merritt"), an unaffiliated and recently incorporat-ed Presbyterian Church.[14] *Id.* at 575–76, 576 n. 4, 464 A.2d 1008. Upon Babcock's withdrawal, United assumed possession of the gifted property and denied Merritt access. *Id.* at 576, 464 A.2d 1008. Merritt filed suit in ejectment, and United filed suit seeking a permanent injunction against interference with United's exercise of its authority over the affairs of Babcock and an order that Merritt transfer and convey back the real and personal property received from Babcock. *Id.* at 576–77, 464 A.2d 1008.

---

12. Full Gospel II was actually the newly created corporation, as it was incorporated under Maryland Law after From the Heart adopted the 1998 amendments changing its name.

13. The Court of Appeals in *Babcock* stated: "Despite inferences to the contrary which may be drawn from corporate names of some churches, '[u]nder the Maryland system of incorporating religious societies *the trustees and not the congregation constitute the corporation.*'" *Babcock,* 296 Md. at 578, 464 A.2d 1008 (quoting *Phillips v. Insley,* 113 Md. 341, 349, 77 A. 850 (1910)) (emphasis added) (alteration in original). Here, the trustees of Full Gospel I were the same as From the Heart. Even if some members of the Full Gospel I congregation parted with the name change and later formed Full Gospel II, those congregants do not constitute the corporation.

14. Merritt was incorporated on April 15, 1980, and Babcock gifted the property on March 14, 1981. *Babcock,* 296 Md. at 575–76, 576 n. 4, 464 A.2d 1008.

In reviewing the Book of Order,[15] corporate documents, church polity, and other relevant documents and circumstances before it, the Court of Appeals concluded that Babcock was bound by the mandates of its bylaws to follow the provisions of United's Book of Order, which provided that a local church may not sell, mortgage, lease, or otherwise encumber its real property without written permission of United. *Id.* at 589, 464 A.2d 1008. Under those provisions, the Court stated that, "if the local church under United's Book of Order could not sell property without permission, it could not give it away." *Id.* at 590, 464 A.2d 1008. The Court held that, because Babcock "was granted no power by its charter to dispose of all or part of its assets by gift," then "[t]he attempted gift here was not in accord with the corporate purpose of Babcock." *Id.*

Although we recognize, as A.M.E. Zion points out, that "the property [in *Babcock* ] was not allowed to follow the defectors to their new congregation," we agree with From the Heart that *Babcock* bears little resemblance to the facts of the instant case. Moreover, the Court in *Babcock* did not base its decision in favor of the denomination on the theory of corporate succession as relied on by A.M.E. Zion in its brief.

### B.

### *Implied Trust*

A.M.E. Zion concedes that the trust clauses in the Discipline apply only to "premises," but insists that "the fact that not all

---

**15.** The Court in *Babcock* acknowledged that the Book of Order contained a provision relative to the control of local church property by the parent church. *Babcock*, 296 Md. at 589, 464 A.2d 1008. One property provision of the Book of Order provided that "[w]henever hereafter a particular church is formally dissolved by the presbytery, or has become extinct by reason of the dispersal of its members, the abandonment of its work, or other cause, such property as it may have, *both real and personal*, shall be held, used, and applied for such uses, purposes, and trusts as the presbytery may be direct, limit, and appoint, or such property may be sold or disposed of as the presbytery may direct. . . ." *Id.* at 584, 464 A.2d 1008 (emphasis added). *Babcock* was not dissolved, nor did it become extinct. *Id.* at 577, 464 A.2d 1008.

property provisions are laid out in the form of an express trust is not fatal to [its] claims." [16] Relying on the theory of implied trust, A.M.E. Zion argues that the plain text of the Discipline "contradict[s] the [c]ircuit [c]ourt's finding that the property provisions in the Discipline relate solely to real property." A.M.E. Zion points to "several provisions" of the Discipline that give A.M.E. Zion authority over all local church property, including From the Heart's personal property. A.M.E. Zion cites the restraint on alienation clause in Paragraph 498.1 of the Discipline, and similar language in § 708(c) of the 1991 Bylaws, to show that there is no distinction between real and personal property. Paragraph 498.1 reads:

> The Trustees shall not in any case whatsoever dispose of Church Property by sale or otherwise without the consent of the majority of the Members in Full Connection, expressed by vote in a meeting called for that purpose, of which due notice has been given. Provided, however, that no congregation, pastor, nor Trustee Board or agent of the congregation shall mortgage or sell any property of the A.M.E. Zion Church without confirmation of the Quarterly Conference and written consent of the Bishop of the District or the Annual Conference. [ [17]]

---

**16.** The successor edition to the 1996 Discipline adopted in 2000 added clear language expressly providing for a trust in A.M.E. Zion's favor extending to all forms of property as well as a reverter clause. The 2000 Discipline states in pertinent part:

> [T]he right of any local church as a whole, or in part, to withdraw from the A.M.E. Zion Church is not recognized and does not exist. Whenever, hereinafter a particular congregation shall cease to function or exist, or is formally dissolved in accordance with the provisions of the *Discipline,* or become extinct by reason of the dispersal of its members, the abandonment of its work, or cause, such property as it may have, whether real, personal, intellectual, tangible or intangible, shall be held in trust by the local Board of Trustees, and, used, and applied for such uses, purposes, and trusts as the Annual Conference, within whose bounds the local church is situated, may direct, limit, and appoint, or such property may be sold or disposed of in accordance with the provisions of the . . . *Discipline.*

**17.** Section 708(c) of the 1991 Bylaws states:

> SECTION 708. RESPONSIBILITIES OF THE BOARD OF TRUSTEES: It is the responsibility of the Board of Trustees to:

A.M.E. Zion argues further that Paragraphs 498.2 and 498.3 also "supply evidence that [From the Heart]—by giving its unqualified consent to the Discipline—submitted all of its property to the ultimate authority and control of A[.]M[.]E[.] Zion." Those provisions state:

> 2. It is further provided that where there is a Church or circuit, or a Station, without a Pastor, because the membership has withdrawn and scattered and there is no Congregation, and no need for an appointment of a Preacher to this place, that the Conference in which the Church is located may pass a resolution declaring the Church or Circuit, or Station discontinued or abandoned and ordering the sale of the property, and approved by the Bishop; the Bishop of the District shall give a deed to the purchaser for the same, and the proceeds from the sale of said property turned over to the Annual Conference for its disposition.

* * *

> 3. Any gift, legacy, devise, annuity, or other benefit to a pastoral charge or local church that accrues or becomes available after said charge or church has been discontinued or abandoned, shall become the property of the trustees of the Annual Conference or Finance Board within whose jurisdiction the said discontinued or abandoned church was located.

When these provisions are "coupled with [From the Heart's] whole-hearted endorsement of, participation in, and acknowledged subjection to A[.]M[.]E[.] Zion's polity," A.M.E. Zion insists that there is "ample evidence upon which a finder of fact could reasonably conclude, by clear and convincing evi-

---

* * *

(c) Dispose of Church property by sale or otherwise only with the consent of the majority of the Members in Full Connection expressed by vote in a meeting called for that purpose, of which due notice has been given; provided, however, that no Congregation, Pastor or Board of Trustees, or agent of the congregation shall mortgage or sell any property of the Church without the written consent of the Bishop of the District or Annual Conference, as set forth in Section 435 of the Discipline.

dence, that [From the Heart] consented to hold even its personal property in trust for A[.]M[.]E[.] Zion and all of its members."

The Court of Appeals in *From the Heart* stated that "[t]rusts arise by either clear and deliberate language or operation of law. They may be express or implied...." 370 Md. at 182, 803 A.2d 548. Further, the Court noted that the existence of a trust, express or implied, must be proven by clear and convincing evidence by the party seeking to establish the trust. *Id.* at 183, 803 A.2d 548; *Levin v. Levin,* 43 Md.App. 380, 387, 405 A.2d 770 (1979) ("The party seeking to establish [an implied] trust has the burden of doing so *by clear, unequivocal, and convincing evidence.*" (Emphasis added)). With regard to the creation of a trust by implication, we have observed that "[i]t is enough that the intention to create a trust is apparent." *Jones v. Endslow,* 23 Md.App. 578, 590, 328 A.2d 339 (1974); *see also Killen v. Houser,* 239 Md. 79, 84, 210 A.2d 527 (1965) ("The trust arises [as] a result of a manifestation of an intention to create it; technical words are not required....").

■ Turning first to the provisions of the Discipline and 1991 Bylaws cited by A.M.E. Zion, we agree with From the Heart that Paragraph 498. 1, and its corresponding § 708(c) in the 1991 Bylaws, do not even purport to create a trust. Both provide for a restraint on alienation during affiliation and thus shed no light on what happens to the property of a withdrawing church. Most critically, the terms "Church Property" and "property" in Paragraph 498.1 refer, as a practical matter, only to real property. If Paragraph 498.1 applied to personal property, From the Heart would have to call a special meeting of all of its members and obtain permission of the Bishop every time it sold a piece of furniture, gave a donation to a needy family, or even wrote a check. Not only is such application of Paragraph 49 8. 1 absurd, but our review of the record reveals that, in practice, From the Heart followed Paragraph 498.1 only for the transfer or sale of *real* property. Finally, by referring to "property" in the context of the

"mortgage" or sale of such property, Paragraph 498.1 clearly indicates that it only applies to real property.

Similarly, A.M.E. Zion's reliance on Paragraphs 498.2 and 498.3 is misguided. We agree with From the Heart that both Paragraphs 498.2 and 498.3, by their plain text, "do not deprive local congregations of their ownership rights in local church property; they merely provide for what happens if there is no longer any local congregation to exercise those rights." Both provisions speak in terms of the discontinuation or abandonment of a local church. Bishop Williams conceded in his deposition that Full Gospel I was "never abandoned." Likewise, the church has not been discontinued. As discussed above, From the Heart still exists as a congregation despite its name change. Therefore, we conclude that Paragraphs 498.2 and 498.3 provide no support for A.M.E. Zion's assertion that there existed a trust in its favor with respect to From the Heart's *personal* property.

Other provisions in the Discipline and From the Heart's governing documents that contain trust language do not support an implied trust in favor of A.M.E. Zion over From the Heart's personal property. The trust provisions of the Discipline at Paragraphs 494 and 495.1 pertain exclusively to real property as evidenced by the use of the language "premises" and "use as a *place* of worship" in Paragraph 494, and the language "premises," "held or hereafter acquired *as a parsonage*," and "parsonage property" in Paragraph 495.1. In addition, Paragraph 491.1 provides: "It is the duty of the Board of trustees to provide a place of worship and take charge of and protect the Church Property *with all of its appurtenances* in trust for the membership...." (Emphasis added). "Appurtenance" is clearly a term associated with real property and again reinforces that the trust language in the Discipline refers only to real property. *See Anne Arundel County v. City of Annapolis,* 352 Md. 117, 125, 721 A.2d 217 (1998) (" 'Real property' is defined similarly in Random House ... as 'an estate or property consisting of lands and of all appurtenances to lands, as buildings, crops, or mineral rights.' ").

Section 708(b) of the 1991 Bylaws required From the Heart's trustees to "[i]nclude the necessary trust clause in deeds *to real property* acquired by the Church, as provided in . . . the Discipline." (Emphasis added). In addition, Section 707(b), which is virtually identical to Paragraph 491.1 of the Discipline, provides: "It is the duty of the Board of Trustees to take charge of and protect the Church property with all it appurtenances in trust for the Membership. . . ."

Even expanding our review of the record beyond the Discipline and From the Heart's governing documents to all of the relevant documents and circumstances, we conclude that there is insufficient evidence to create a genuine issue of material fact as to the existence of an implied trust in favor of A.M.E. Zion with respect to From the Heart's personal property. Without such implied trust, From the Heart is entitled to retain ownership and control of its personal property upon disaffiliation from A.M.E. Zion. Therefore, we hold that the circuit court did not err in granting summary judgment in favor of From the Heart with regard to its personal property.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED; COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**